In re Esther BERGMAN, Debtor.

NORFOLK AND WESTERN RAILROAD CO., Southern Railroad Co., Union Pacific Railroad Co., Missouri Pacific Railroad Co., Western Pacific Railroad Co., Spokane International Railroad Co., Missouri–Kansas–Texas Railroad Co., Burlington Northern Railroad Co., Consolidated Rail Corporation, Plaintiffs,

v.

Esther BERGMAN, Defendant.

In re David E. WASSERSTROM, Debtor.

NORFOLK AND WESTERN RAILROAD CO., Southern Railroad Co., Union Pacific Railroad Co., Missouri Pacific Railroad Co., Western Pacific Railroad Co., Spokane International Railroad Co., Missouri–Kansas–Texas Railroad Co., Burlington Northern Railroad Co., Consolidated Rail Corporation, Plaintiffs,

v.

David WASSERSTROM, Defendant.

Bankruptcy Nos. 88–101235, 88–101705. Adv. Nos. 88–04265, 88–04275.

United States Bankruptcy Court, E.D. Pennsylvania.

Aug. 28, 1989.

Paul D. Keenan, Susan L. Parsons, Katherine McAlice, Philadelphia, Pa., for plaintiffs.

Jonathan H. Ganz, W.J. Winterstein, Jr., Philadelphia, Pa., for debtors/defendants in Adversary proceedings.

Edwin E. Thompson, Ambler, Pa., for debtors in main bankruptcy cases.

Anthony Barone, Aris J. Karalis, Philadelphia, Pa., for Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The Plaintiffs in these consolidated adversarial proceedings, nine (9) interline railroads (hereinafter "the Plaintiffs"), seek a determination that the individual Chapter 7 Debtor–Defendants' debts owed to them for failure of the Debtors' railroad to remit collections due to the Plaintiffs are non-dischargeable. An unusual aspect of this matter is that the Debtors' liabilities on these debts were established in a judgment entered by the district court in deciding another count of this very proceeding. We conclude that application of the related doctrines of *stare decisis* and collateral estoppel requires that the Plaintiffs must succeed under 11 U.S.C. § 523(a)(4) on the ground that the Debtors are chargeable with defalcations while acting in the fiduciary capacity of trustees as to the funds collected by operation of law.

### B. PROCEDURAL HISTORY

On May 5, 1986, the Plaintiffs filed suit against the Debtors and two corporations controlled by them, CENTRAL INDUSTRIES, INC. (hereinafter "CI") and CENTRAIL MANAGEMENT, INC. (hereinafter "CM"), in the local district court, at C.A. No. 86–2613 (E.D.Pa.). This matter was assigned to the Honorable Norma L. Shapiro. On January 14, 1988, and January 19, 1988, respectively, Debtor DAVID E. WASSERSTROM (hereinafter "Wasserstrom") and Debtor ESTHER S. BERGMAN (hereinafter "Bergman") (Wasserstrom and Bergman are collectively referred to herein as "the Debtors") filed an individual Chapter 7 and an individual Chapter 13 bankruptcy petition, respectively, in this court. Bergman's case was converted to Chapter 7 upon her request on March 28, 1988.

On March 17, 1988, the Plaintiffs filed the above-captioned two adversary proceedings in this court against each of the Debtors. The Complaints in these proceedings recited seven Counts, Count I of which alleged that the obligations of the Debtors to the Plaintiffs were nondischargeable under 11 U.S.C. §§ 523(a)(2) and (a)(4), and Count II of which alleged that the Debtors converted railroad freight revenue trusts funds to their own personal use.[1]

On May 18, 1988, we issued a pre-trial Order indicating that we would hear only Count I of the Complaint at a trial commencing on June 13, 1988, because we believed that, insofar as the other Counts sought recoveries from the Debtors' estates (the only issue related to the Debtors' bankruptcies), the matters raised therein should be resolved via the claims process. *See In re Stelweck,* 86 B.R. 833, 844–45 (Bankr.E.D.Pa.1988). However, before the established trial date, the district court, per the Honorable Robert J. Kelly, withdrew the reference of the entire adversary Complaints on May 26, 1988, and ultimately transferred them to Judge Shapiro, who consolidated them with C.A. No. 86–2613.

On July 11, 1988, the Debtors filed a motion for summary judgment in their favor as to all Counts in C.A. No. 86–2613 and these proceedings in the district court. On August 11, 1988, the Plaintiffs therein filed a cross-motion for summary judgment as to only Count II (conversion) of the three actions. The matters next re-surfaced in our court when CI and CM filed Chapter 7 cases, on July 1, 1988, at Bankr. Nos. 88–12307S and 88–12308S, respectively. By an Order of November 22, 1988, we granted the Plaintiffs relief from the automatic stay to pursue these parties, although we dismissed, without prejudice, separate proceedings against CI and CM in our court (Adv. Nos. 88–2023S and 88–

---

1. The other Counts included three separate claims based upon the Pennsylvania Uniform Fraudulent Conveyances Act, 39 P.S. § 351, *et seq.,* and a Count based upon the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

02024S).[2]

On April 11, 1989, Judge Shapiro filed a Memorandum and Order in which she denied the Debtors' motion for summary judgment and granted the Plaintiffs' similar motion. By Order of May 15, 1989, Judge Shapiro entered judgments against Bergman in the amount of $37,500.00 and against Wasserstrom in the amount of $470,390.62, the latter on a motion to reconsider the amount set forth in the Order of April 11, 1989. See page 665 n. 4 *infra*.

In that same Order of May 15, 1989, Judge Shapiro referred Count I of these proceedings (dischargeability) back to this court. After Judge Shapiro denied Wasserstrom's further motion for reconsideration, the Debtors filed a notice of appeal of her final Orders to the Court of Appeals at No. 89–1629 (3d Cir.).

On May 18 and May 19, 1989, we entered Pre-trial Orders which, *inter alia*, scheduled the trial of these matters on July 25, 1987. On July 13, 1987, both parties agreed in a conference call with this court as to how they wished to present these matters to us, which we memorialized in an Order of July 14, 1989. The parties agreed that a Stipulation of Facts and attachments thereto which had been the entire record presented to Judge Shapiro, plus her Memorandum and Order of April 11, 1989, plus one additional factual paragraph added to the Stipulation would constitute the record in this court. They also agreed to file Briefs in support of their respective positions in addition to that already prepared by the Plaintiffs in support of a motion for summary judgment in this court as follows: the Debtors on or before July 28, 1989, and the Plaintiffs a reply on or before August 10, 1989. The latter date was subsequently extended by agreement until August 14, 1989.

On August 2, 1989, the Debtors filed an "Objection" to the Plaintiffs' plans, apparently articulated to the Debtors' counsel, to move to amend the Complaint in order to add a reference to 11 U.S.C. § 523(a)(6) and address dischargeability under this Code section in their reply brief. On August 16, 1989, the plaintiffs filed a motion to strike this Objection and for permission to amend their Complaint, which has been scheduled for a hearing on September 14, 1989. In our view, our disposition of this proceeding in favor of the Plaintiffs solely on the basis of their claim under § 523(a)(4) renders disposition of this motion moot.

This Opinion is prepared in narrative form because we are deciding this proceeding on a stipulated record and are therefore not obliged to make any findings of fact.

## C. THE DISTRICT COURT DECISION IS NOT RES JUDICATA OF THE ISSUES IN THIS PROCEEDING, BUT THE PARTIES ARE COLLATERALLY ESTOPPED TO CONTEST THE FACTUAL FINDINGS MADE THERE.

■ We begin our decision-making process by carefully analyzing the impact of the contents of District Court Judge Shapiro's Memorandum of April 11, 1989, upon the outcome of this proceeding. In *Brown v. Felsen*, 442 U.S. 127, 134–39, 99 S.Ct. 2205, 2211–13, 60 L.Ed.2d 767 (1979), the Court held that a state-court decision, irrespective of its contents, could not have *res judicata* effect on a bankruptcy court's determination of dischargeability. This is because of the Court's finding that dischargeability is "the type of question Congress intended that the bankruptcy court would resolve." *Id.* at 138, 99 S.Ct. at 2212. Thus, even "[i]f a state court should expressly rule on [dischargeability] questions," *id.* at 135, 99 S.Ct. at 2211, the bankruptcy court was not bound by such rulings and was obliged to make its own independent determination as to them. However, the court did allow the application of "the narrower principle of collateral estoppel" from state-court cases to dis-

---

**2.** Our action was based upon our perception that (1) Dischargeability of these corporate debtors in Chapter 7 cases was not an issue. See 11 U.S.C. § 727(a)(1); and (2) The proper procedure to obtain distribution of any assets of the estate of these debtors was the claims process, not a lawsuit against them. *See, e.g., In re Clark*, 91 B.R. 324, 338–39, 342 (Bankr.E.D.Pa. 1988).

chargeability proceedings. *Id.* at 139 n. 10, 99 S.Ct. at 2213 n. 10. Thus, "[i]f in the course of adjudicating a state law question, a state court should determine factual issues identical to those [relevant to dischargeability], then collateral estoppel, in the absence of countervailing statutory policy, would bar relitigation of those issues in the bankruptcy court." *Id.*

Although the April 11, 1989, Memorandum constitutes a decision of a *federal* court rather than a state court and was a determination on certain issues in the same litigation as the proceedings before us, we believe that the district court's decision must be accorded only as much weight in a dischargeability proceeding as would a separate state-court determination in an independent proceeding. The district court had (and in fact has exercised) power to withdraw the reference of this proceeding to itself. 28 U.S.C. § 157(d). However, had it chosen to decide Count I of this proceeding, the district court would have had to sit as a bankruptcy court. Having already ruled in favor of the Plaintiffs on the merits, the court was probably disinclined to also rule on dischargeability, a ruling in favor of the Debtors in which could have effectively nullified its prior ruling.[3] The district court's reference of Count I of this proceeding back to this court, which is permissible for any purpose under 28 U.S.C. § 157(a), was perhaps perceived as a means of assuring objectivity by allowing the dischargeability issue to be litigated in a different forum. We therefore perceive no "signal" to this court from the district court as to the preferred outcome herein from the fact that this proceeding was referred back to us at this time. It was apparently a measure to insure objective decision-making. Therefore, again, we observe that we must accord the district court decision the same (and no more) collateral estoppel impact as a prior state-court decision.

Collateral estoppel, or issue preclusion, applies in dischargeability proceedings, as in any other legal actions, if and only if the following four requirements are met as to the issue in question:

> "(1) the issue sought to be precluded must be the same as involved in the prior action; (2) that issue must have been actually litigated; (3) it must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment." *Matter of Ross*, 602 F.2d 604, 606 (3d Cir.1979) *quoting Haize v. Hanover Ins. Co.*, 536 F.2d 576, 579 (3d Cir. 1976).

*In re Gaebler*, 88 B.R. 62, 65–66 (E.D.Pa. 1988). We now turn to the district court's decision and to the criteria for determining dischargeability pursuant to 11 U.S.C. § 523(a)(4), the primary grounds for non-dischargeability relied upon by the Plaintiffs, to determine whether these four requirements are met here.

## D. THE DISTRICT COURT'S DECISION

We must carefully examine the Memorandum of the district court in order to determine whether this decision will have any collateral estoppel effect on this proceeding and, if so, as to what issues. In so doing, we begin by quoting extensively from the district court opinion, 1989 WL 36958. Initially, we note the following statements regarding the factual background, slip op. at 2–4:

> The North Central Texas Railroad (hereinafter "NCTR") operated for ten (10) months in 1982 on 90 miles of leased track in the Dallas–Fort Worth area. The NCTR was both a destination carrier

---

**3.** As we pointed out in our Order of May 18, 1988, a ruling in favor of the Debtors as to dischargeability would have confined the Plaintiffs to a recovery from the non-exempt assets of the Debtors' bankruptcy estates. Non-exempt state assets may have been non-existent and were in all probability limited. It was for this reason that we believed that the dischargeability issue should have been litigated first. We continue to believe that deciding dischargeability first would have avoided the awkwardness in the district court's having first ruled on the merits, and then afterwards being faced with the prospect of substantially nullifying the effect of its own decision by ruling on dischargeability. It also may have been possible to avoid ever deciding the merits, especially had the debts been determined dischargeable, had dischargeability been decided first.

and/or originating carrier for shipments going in and out of the Dallas–Fort Worth area. Under the accounting system established for interline shipments, a shipper or receiver paid only one of the shipping railroads for transporting an entire shipment even though the shipment may actually have travelled over the lines of many railroads. The Third Circuit has characterized the system of accounting used by the interline railroads:

"The nation's railroads function in many ways as a single system. For example, a shipper or receiver pays one railroad for services of carriage for the entire shipment, although the shipment may travel over many different railroads; a railroad car may travel over the lines of many different railroads, and be used by each of them, before it again returns to the possession of the owning railroad; and a shipper whose freight may have been damaged in shipment by one of several carriers may apply to any of them for payment of his claim. The railroads have created a system of accounting and periodic settlement of accounts to facilitate this matter of operation. The accounting for various types of railservice rendered to the public or to other railroads results in "interline accounts," and the striking of balances between the railroads with respect to these interline accounts results in "interline balances." Each of the accounts is settled separately; there is no netting of the balances in different accounts."

*In re Penn Central Transportation Company*, 486 F.2d 519 (3d Cir.1973) [*,cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974)].

Either the carrier of origination or destination collects not only its charges but also the sums earned by each of the interline carriers over whose tracks a shipment has travelled. Funds collected are placed initially in the collecting carrier's general account. The collections made for other interline railroads are allocated, settled and paid monthly. No interest is paid by any collecting carrier for the time during which it holds revenue of another carrier. *See generally In re Penn Central Transportation Company*, at 486 F.2d at 523–24 (discussing the operation of freight and passenger accounts).

Late in 1982, NCTR learned that it would be unable to renew its track lease and its subsequent effort to buy the track necessary to operate NCTR failed. NCTR ceased operation as a railroad at 12:00 midnight on December 31, 1982, but the corporation continued to conduct business in 1983 in order to conclude its affairs.

NCTR was owned by Central Industries ("CI"), a corporation owned in turn by Defendants David Wasserstrom ("Wasserstrom") and Esther Bergman ("Bergman"). NCTR entered into a contract with Central [sic] Management ("CM"), also owned by CI, to provide all managerial functions for NCTR concerning track and rolling stock, negotiations, railroad operation, supervision, and payroll, bookkeeping and accounting operations, including all interline freight accounting.

Plaintiffs in this action are rail carriers participating in freight movements for which NCTR collected the freight charges. These plaintiffs allege that NCTR failed to make distribution to plaintiffs of $667,837 in freight charges, collected and *held in constructive trust for them*, but instead disbursed most of their recognized freight revenue to Wasserstrom and Bergman through CI and CM in a series of *fraudulent* transactions (emphasis added).

The district court then renders the following specific findings regarding the operations of the Debtors' businesses in 1982 and 1983, slip op. at 6–7:

In 1982, NCTR collected and distributed almost three million dollars in freight revenue to participating rail carriers. NCTR also collected, but did not distribute, an additional $2,380,504 in freight revenue. Of this money, the defendants

admit that $236,094.00[4] is owed to the plaintiffs. Even though it did not pay plaintiffs the money it owed, NCTR transferred a management fee to CM. CM then transferred $720,000 as a management fee to its parent corporation, CI. Bergman and Wasserstrom, the sole shareholders of CI and the controlling officers of both CM and NCTR, also received loans and consulting fees of at least $610,000 from CI.

In 1983, although no longer an operating railroad, NCTR collected $506,304 in interline freight revenue, but distributed none of this to participating rail carriers and transferred this money was [sic] to CI instead. CI then disbursed $374,000 in loans and consulting fees to Wasserstrom and $39,000 in loans to Bergman. CM disbursed an additional $55,000 in loans to Wasserstrom (footnote in original omitted).

The district court then proceeds to conclude as follows, slip op. at 7–11:

Defendant NCTR breached its fiduciary duty to plaintiffs by not distributing their funds to them and plaintiffs are entitled to a remedy compensating them for the loss sustained as a result of the breach. A trust beneficiary can recover the trust property from the trustee or one holding it with notice of the breach of trust. A beneficiary can follow the object of a trust or its traceable proceeds to the persons subsequently acquiring possession with notice of the trust and obtain a court order for the return of the trust property or its proceeds. *See* Trusts, Bogert, § 161.

Plaintiff interline railroads, as beneficiaries of the trust, must "trace" the funds that were collected by the railroad for the benefit of the other interline shippers. To recover, plaintiffs must prove not only the situs of the trust property, but that the property was received by the possessor with notice of the trust. If the interline railroads, as beneficiaries of the trust, successfully trace trust funds converted by others with knowledge of their

source and nature, plaintiffs are entitled to the return of those funds. *See generally*, Trusts, Bogert, § 161.

It is undisputed that NCTR was an operating railroad in 1982. The interline freight accounting records of NCTR (Defense Ex. B) show that the NCTR collected, but did not distribute, $2,380,500 of interline freight revenue. Plaintiffs assert that they are entitled to $471,174 of this sum as a matter of law because the amount due is undisputed. In the stipulated facts submitted to the court, defendants agree that as of May 17, 1984, the date NCTR filed a petition under Chapter VII [sic] in the Bankruptcy Court for the Eastern District of Pennsylvania, NCTR owed the following interline freight settlements: $11,640 to Norfolk and Western Railroad; $42,209 to Southern Railway; $28,687 to Union Pacific Railroad; $1,064 to Eastern Pacific Railroad; $848 to Spokane International Railroad; $151,-646 to Missouri Kansas Texas Railroad, a total of $236,094.

As controlling officers of NCTR and CM as well as sole shareholders of CI, the parent company of CI and NCTR, defendants Bergman and Wasserstrom knew or should have known that the funds owed to the other interline freight shippers as a result of interline transport in 1982 and 1983 were held subject to a constructive trust imposed on them for the benefit of the plaintiffs and other interline shippers similarly situated. The individual defendants knowingly participated in the misuse and diversion of trust funds for personal and improper corporate purposes. This misuse and diversion of trust funds constituted actionable misconduct on the part of the defendants because of their knowledge of the constructive trust imposed on the funds.

In 1982, while collecting, but not distributing, $2,380,504 in freight receipts, NCTR transferred $600,000 to its sibling corporation, CM. This transfer of funds was recorded on the books and consol-

---

**4.** The district court originally held that this sum was the only amount due but, on the Plaintiffs' motion for reconsideration, it entered judgment against Wasserstrom in the amount of $470,-390.26.

idated tax worksheets as a "management fee" (Defense Ex. D). CM's payment of $720,000 to CI was also recorded as a "management fee" (Defense Exs. D and E). This money was then transferred directly to Wasserstrom and Bergman through a series of transactions without protection of the funds on which a trust was imposed. CI transferred by check and wire transfer a total of $328,500 to Wasserstrom as "loans." CI also transferred by check and wire transfer an additional $188,000 to Wasserstrom as "consulting fees." Finally, CI transferred $39,000 to defendant Esther Bergman as a "loan." In addition to the funds acquired by defendants through CI, CM also transferred by checks $55,000 to Wasserstrom and $39,500 to Bergman also as "loans." These "loans" were interest-free and there has been no actual cash repayment. Defendant Wasserstrom claims that these loans were credited against his salary and bonuses (Defense Ex. M and N). Bergman similarly states that the loans may have been forgiven because credited as compensation.

Although not an operating railroad in 1983, NCTR continued in existence and continued to collect interline freight revenue. NCTR records show that it collected a total of $506,304 in interline freight revenue in 1983. NCTR made no payments to any participating rail carrier during that period of time; all money collected in freight revenue was retained by NCTR as its own.

The accounting records show that NCTR received total revenues of $943,467 in 1983 and transferred $961,700.68 to CM. The payments to CM consisted of $65,500, termed "management fees," and $896,200, termed "repayment of expenses," allegedly paid by CM or related companies on behalf of NCTR. Of this amount, CM paid Wasserstrom $55,000, as a "loan," and paid the balance to CI. More than $900,000 of NCTR receipts, including $506,304 in interline freight receipts, were transferred to CI's concentration account. As in 1982, much of these transferred funds ultimately reached defendants Wasserstrom and Bergman. In 1983, Wasserstrom received $186,000 as "loans" and $188,000 as "consulting fees" from CI. In that same year, Bergman received from CI $39,000 ($24,000 as a "loan" and three unexplained checks in the amount of $5,000 each). In addition, Wasserstrom received $55,000 from CM as a "loan."

Regardless of the form or the label, the defendants came into personal possession of *funds that were subject to a constructive trust which* precluded defendants from using that money for corporate or personal purposes; the funds could only be transferred to the shippers for whom they were collected (footnote in original omitted) (emphasis added).

E. IN ORDER TO SUCCEED IN A DISCHARGEABILITY COMPLAINT UNDER THE "DEFALCATION" PROVISION OF § 523(a)(4), IT IS NECESSARY FOR THE PLAINTIFF TO ESTABLISH THE REQUISITE FIDUCIARY RELATIONSHIP BY "CLEAR AND CONVINCING" EVIDENCE AND THE BREACH OF THAT DUTY BY AT LEAST THE PREPONDERANCE OF THE EVIDENCE.

The Plaintiffs have, through the filing of their reply brief, alleged four separate theories under which they contend that the Debtors' indebtedness to them could be determined to be non-dischargeable: (1) 11 U.S.C. § 523(a)(2)(A); (2) 11 U.S.C. § 523(a)(4) (defalcation); (3) 11 U.S.C. § 523(a)(4) (embezzlement); and (4) per their request to amend their Complaint, 11 U.S.C. § 523(a)(6). These Code sections provide as follows:

§ 523. Exceptions to discharge

(a) A discharge under section 717, 1141, 1128(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.     .     .     .     .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition;

.    .    .    .    .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny:

.    .    .    .    .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...

Most prominent among these alternative bases was the claim of defalcation under 11 U.S.C. § 523(a)(4). We therefore consider this claim first.

Two recent decisions of this court, per our colleague, the Honorable Bruce Fox, have reviewed the burden of proof upon the plaintiff in such a case. *In re James*, 94 B.R. 350, 352 (Bankr.E.D.Pa.1988); and *In re Borbidge*, 90 B.R. 728, 733 (Bankr.E.D.Pa.1988). In these cases, Judge Fox held that the presence of the requisite fiduciary capacity necessary to support a defalcation claim must be proven by "clear and convincing" evidence, but that the defalcation itself need only be proven by a preponderance of the evidence.

With respect to the nature of the fiduciary relationship that must be proven in a defalcation claim, Judge Fox states, in *James*, 94 B.R. at 352, that

it is well established that the requirement that the debtor be acting in a fiduciary capacity refers to express trusts and not trusts *ex maleficio* which may be imposed due to the very wrongful act out of which the debt arose. *In re Lane*, 76 B.R. 1016, 1022 (Bankr.E.D.Pa.1987); [5] *In re Kapnison*, [65 B.R. 221 (Bankr.D. N.M.1986)]; *In re Gould*, 65 B.R. 87 (Bankr.N.D.N.Y.1986); *In re Kwiat*, 62 B.R. 818 (Bankr.D.Mass.1986) [*aff'd sub nom. Kwiat v. Doucette*, 81 B.R. 184 (D.Mass.1987)]; 3 COLLIER [COLLIER ON BANKRUPTCY,] ¶ 523.14[1] at 523–93 to 523–96 [15th ed. 1988]. *See also In re Napoli*, 82 B.R. 378, 381 [Bankr.E.D. Pa.1988).

*See also In re Ramonat*, 82 B.R. 714, 719 (Bankr.E.D.Pa.1988) (per TWARDOWSKI, CH. J.); and *In re Salamone*, 78 B.R. 74, 76 (Bankr.E.D.Pa.1987) (per FOX, J.).

## F. THE APPLICATION OF THE DISTRICT COURT DECISION TO THE PERTINENT LEGAL PRINCIPLES; THE APPEAL OF THE DISTRICT COURT'S DECISION DOES NOT HAMPER ITS COLLATERAL ESTOPPEL EFFECT.

We now begin the process of applying the principles set forth above concerning collateral estoppel arising from the district court decision at hand to the principles for determination of dischargeability under § 523(a)(4). The issue most vigorously disputed by the parties is whether the district court's repeated use of the terms "constructive trust," emphasized in the quotations above, renders the fiduciary relationship here something other than an "express trust," equally as unable to meet the requirements of a "fiduciary capacity" under § 523(a)(4) as a trust *ex maleficio*.

In reaching our decision, it must be recalled that we have the rather unusual benefit of not only the court decision which is allegedly the basis of the application of collateral estoppel, but also the entire record of the proceedings before the court that made that decision. Therefore, we can render our decision on the basis of this record *plus* the four corners of Judge Shapiro's Memorandum. Also, we observe that the procedural status of the matters before us is not that most common when collateral estoppel issues are raised in dischargeability proceedings, *i.e.* on cross-motions for summary judgment which could both be denied and the matter be set down for a trial. *See, e.g., In re Butler*, 86 B.R. 829, 830, 833 (Bankr.E.D.Pa.1988). Rather, pursuant to our Order of July 14, 1989, what has been presented is a stated, paper record. We are obliged to rule for the one party or the other solely on the basis of this record.

One issue which neither party has raised or discussed is the impact of the Debtors'

---

**5.** This case was the only decision prior to the instant proceeding in which the undersigned considered a § 523(a)(4) claim in extended fashion.

appeal from the district court's decision upon its potency for collateral estoppel purposes. It appears that this jurisdiction adheres to "[t]he federal rule ... that pendency of an appeal does not suspend the operation of an otherwise final judgment as res judicata or collateral estoppel, ..." 1 J. MOORE, FEDERAL PRACTICE, ¶ 0.416[3], at 521 (2d ed. 1988). *See Connelly v. Wolf, Block, Schorr & Solis-Cohen,* 463 F.Supp. 914, 918 n. 3 (E.D.Pa. 1978); and *Cyclops Corp. v. Fischbach & Moore, Inc.,* 71 F.R.D. 616, 618 (W.D.Pa. 1976). Pennsylvania state law is apparently to the contrary. *See Roodveldt v. Merrill Lynch, Pierce, Fenner & Smith,* 585 F.Supp. 770, 776 (E.D.Pa.1984); and *In re Levitt,* 18 B.R. 595, 598 n. 11 (Bankr.E.D. Pa.1982). However, although we are a federal court sitting in Pennsylvania, we are rendering decision on an issue exclusively reserved to this federal bankruptcy court. *Brown, supra,* 442 U.S. at 134–39, 99 S.Ct. at 2211–13.

■ Hence, federal law rather than state law regarding the impact of the Debtors' appeal must control. The collateral estoppel effect of the district court decision is not suspended by the appeal. As a result, we must adhere to those conclusions of the district court in its decision to which principles of collateral estoppel are applicable.

G. THE PRINCIPLE OF *STARE DECISIS* IN THE FORM OF CONTROLLING THIRD CIRCUIT PRECEDENT IN THE *PENN CENTRAL TRUST FUNDS CASE* ESTABLISHES THAT THE DEBTORS' CORPORATIONS HELD THE PLAINTIFFS' FUNDS IN AN EXPRESS ACCOUNT.

■ The *Penn Central* decision from which the district court quotes copiously was decided en banc by the Court of Appeals. Rejecting prior caselaw to the contrary in the Circuit, the court there firmly holds, 486 F.2d at 524, as follows:

Accommodating and applying traditional common law trust principles to the unique regulatory scheme and accounting policies used by the nation's railroads, we have concluded that transpor-

tation and freight charges, *when collected,* are held in trust for the Interlines.

The principal argument of the Debtors in response to the *Penn Central* decision, commonly referred to and therefore hereinafter referenced as "the *Trust Funds Case,"* is that a recent decision of the Seventh Circuit, *In re Iowa R.R.,* 840 F.2d 535 (7th Cir.1988), is controlling here rather than the *Trust Funds Case* because the system of drafting invoices to the interline carriers used by NCTR was more closely comparable to that used by the Iowa Railroad than that utilized by the huge railroad in issue in the *Trust Funds Case.*

This distinction is unconvincing. It is clear to us that the Seventh Circuit panel in *Iowa R.R.* simply refused to follow either the majority opinion, 840 F.2d at 542–45, or the concurring opinion, *id.* at 540–42, in the *Trust Funds Case.* As a Court of Appeals of another Circuit, that court was not bound to follow the *Trust Funds Case. But see In re Ann Arbor R.R.,* 623 F.2d 480, 482 (6th Cir.1980) (reasoning of the *Trust Funds Case* is followed).

However, *we* are bound by the rulings in the *Trust Funds Case* due to the application of the principle of *stare decisis.* Only the Third Circuit Court of Appeals sitting en banc would be empowered to overrule the *Trust Funds Case* in this Circuit. *See, e.g., Poulis v. State Farm Fire & Casualty Co.,* 747 F.2d 863, 867 (3d Cir.1984); *In re Penn Central Transportation Co.,* 553 F.2d 12, 16–17 (3d Cir.1977) (hereinafter referenced as *"Penn Central II"*); and *Sprague, Levinson & Thall v. Advest, Inc.,* 623 F.Supp. 11, 13–14 (E.D.Pa.), *aff'd,* 780 F.2d 1016 (3d Cir.1985). We disagree totally with the Debtors' assertion that the Third Circuit Court of Appeals subsequently limited the holding in the *Trust Funds Case* to the specific context in which it was rendered in *In re Lehigh & N.E.Ry.,* 657 F.2d 570 (3d Cir.1981). In the *Lehigh & N.E.* case, the Court merely held that the *Trust Funds Case* did not purport to resolve an issue of priority between an interline railroad for whom a connecting railroad had collected freight charges and a *secured* creditor. *Id.* at 577–78. However, the *Lehigh & N.E.* case in no sense ques-

tioned the primary holding in the *Trust Funds Case:* that the funds collected by the connecting railroad *were* trust funds and, as in *Penn Central II, supra,* 553 F.2d at 16–17, the Court of Appeals, in *Lehigh & N.E.,* reaffirmed its holding in the *Trust Funds Case.*

The Debtors are therefore left with only the following argument: (1) Judge Shapiro consistently labelled the type of trust in which the Debtors' railroad held the funds of the Plaintiffs in issue as a "constructive trust;" (2) this court has held that a "constructive trust" is in some contexts not an "express trust" sufficient to establish a fiduciary duty for purposes of § 523(a)(4), *see Ramonat, supra,* 82 B.R. at 719; and *Lane, supra,* 76 B.R. at 1022,; therefore, (3) the collateral estoppel effect of the district court decision supports the Debtors' position rather than that of the Plaintiffs.

While we certainly believe that most aspects of the district court's decision satisfy the four criteria necessary to apply collateral estoppel articulated at pp. 663–64 *supra,* quoting *Ross, supra;* and *Gaebler, supra,* we do not believe that the characterization of the trust created by the collections of the Plaintiffs' freight charges as "constructive" fits within that category. Applying the last of their four criteria, we find that the issue of whether the trust which the *Trust Funds Case* holds is created is "constructive" or "express" was not essential to the district court's decision and it is doubtful whether this precise issue was litigated therein. We thus find that, for purposes of a § 523(a)(4) analysis, this issue was *not* litigated in the district court. Therefore, we must independently determine this issue here.

We start with the language of the *Trust Funds Case* itself. Nowhere therein do we find the presence of the terms "constructive trust." To the contrary, in the passage quoted at page 668 *supra,* the Court of Appeals expresses the view that, pursuant to both common law principles and principles of the unique regulatory scheme of the nation's railroads, the funds received by collecting railroads from interline railroads are subject to actual, "express

trusts" in favor of the interline railroads in every sense of these terms.

It is clear that the term "constructive trust," as utilized in *Ramonat,* is meant to apply to a trust *ex maleficio,* arising only due to the very wrongful act out of which the debt alleged to be dischargeable arises. *Accord, James, supra,* 94 B.R. at 352; and *Borbidge, supra,* 90 B.R. at 733. It is equally clear that the trust which the district court found to exist here is *not* a trust which arose only out of the Debtors' wrongful acts. Rather, the *Trust Funds Case* and its progeny hold that a trust exists over an above any trust which may arise *ex maleficio* as a result of the particular act of receipt of funds on behalf of an interline railroad by a collecting railroad.

The facts of the recent cases decided under § 523(a)(4) in this jurisdiction bear out this distinction. In *Ramonat* it was alleged that a "trust" was created on behalf of an institutional lender by individual borrowers who misrepresented the use to which the loan proceeds would be put. In *Lane* a "trust" was alleged to have arisen on behalf of a lover who placed certificates of deposit in the name of his paramour, allegedly for tax purposes, as to the paramour, who we found had been presented with the certificates as a gift. In these contexts, there was no basis independent from the alleged wrongful acts of the debtors on which to find the existence of a fiduciary relationship.

However, the facts of the *James* and the *Borbidge* cases exemplify the degree of a fiduciary relationship that is necessary to give rise to an express trust for purposes of § 523(a)(4). *Borbidge* involved the son and sister-in-law of an elderly widow who used the proceeds of the widow's accounts. This relationship was found to constitute an "express trust" for purposes of § 523(a)(4). *James* involved an insurance agent holding premiums for insurers, whose brother/employee (rather than himself) was responsible for the failure to remit premiums due. The parties stipulated to the presence of an "express trust" sufficient to support a § 523(a)(4) claim, 94 B.R. at 353, arising from the statutory duties of insurance brokers. Other examples of relationships held to create express trusts by this court concerned a real estate broker

who was entrusted to hold sellers' deposits in escrow, *In re Wolfington,* 48 B.R. 920, 923–25 (Bankr.E.D.Pa.1985); and *In re Wolfington,* 47 B.R. 762, 764–66 (Bankr.E. D.Pa.1985); and a friend holding moneys withdrawn from a bank by a wife to thwart a counter-withdrawal by her husband in the course of a marital dispute. *In re Mullican,* 24 B.R. 161, 163 (Bankr.E.D.Pa.1982). While we questioned the *Wolfington* and *Mullican* results in *Lane, supra,* 76 B.R. at 1022–23, we need not go nearly so far as did the courts in those cases to find an express trust for purposes of § 523(a)(4) here. Rather, here, the relationship between the Debtors and the Plaintiffs is one which the controlling authority of our Court of Appeals has declared *is* an express trust.

We must allow that there is no trust instrument between the parties here. However, no trust instrument was present in *James* or *Borbidge,* as well as in the *Wolfington* cases or *Mullican.* It is well established that "a statute or other state law may create fiduciary status ... which is cognizable in bankruptcy proceedings" under § 523(a)(4). *In re Long,* 774 F.2d 875, 878 (8th Cir.1985). *Accord, In re Stone,* 94 B.R. 298, 302 (S.D.N.Y.1988); and *James, supra,* 94 B.R. at 353. In light of the *Trust Funds Case,* we do not hesitate to conclude that applicable law here creates a fiduciary status which gives rise to cause of action for non-dischargeability under § 523(a)(4).

H. GIVEN OUR FINDING THAT REQUISITE FIDUCIARY RELATIONSHIP EXISTS HERE TO GIVE RISE TO A CLAIM OF "DEFALCATION" UNDER § 523(a)(4), THE COLLATERAL ESTOPPEL EFFECT OF THE DISTRICT COURT DECISION RENDERS THE DEBTORS' INDEBTEDNESS TO THE PLAINTIFFS NON–DISCHARGEABLE.

■ In rendering a decision in favor of the Plaintiffs on Count II of the complaint, it was essential for the district court to make the following rulings: (1) NCTR breached its fiduciary duties as a collecting railroad to the Plaintiffs. Slip op. at 7, pp. 664–65 *supra;* and (2) The Debtors knowingly participated in the misuse and diversion of the trust funds through corporations which they totally controlled and they are therefore personally chargeable with the breach of such fiduciary duties by NCTR. Slip op. at 8–9, pp. 665–66 *supra.* All of the other criteria for applicability of collateral estoppel quoted at pp. 663–64 *supra* are clearly present as to the district court's findings as to these issues, *i.e.,* identity of the issues, actual litigation of the issues, and the entry of a final judgment.

Therefore, the obligations of the Debtors to the Plaintiffs are non-dischargeable as defalcations pursuant to § 523(a)(4), largely on the basis of collateral estoppel. *See also Stone, supra,* 94 B.R. at 300–02; *Kwiat v. Doucette,* 81 B.R. 184, 188–89 (D.Mass.1987); *In re Becker,* 100 B.R. 811, 814 (Bankr.E.D.Va.1988); and *In re Levitt,* 18 B.R. 598, 600–02 (Bankr.E.D.Pa.1982).

I. OF THE ALTERNATIVE THEORIES CITED BY THE DEBTORS AS BASES FOR NON–DISCHARGEABILITY, ONLY THE CLAIM UNDER § 523(a)(6) APPEARS TO BE VIABLE, AND OUR DECISION ON THE BASIS OF § 523(a)(4) RENDERS THE PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT TO ADD A COUNT UNDER THIS CODE SECTION MOOT.

The Plaintiffs alternatively sought to have the obligations of the Debtors to the Plaintiffs declared nondischargeable on the basis of § 523(a)(2)(A), § 523(a)(4) (embezzlement), and § 523(a)(6).

■ However, in order to succeed in a claim under § 523(a)(2)(A), the Plaintiffs were obliged to

establish all of the following elements by the demanding standard of "clear and convincing evidence:"

(1) that the debtor made the representation;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relief [relied] on such representations;

(5) that the creditor sustained the alleged loss and damages as a proximate result of the representations having been made.

*Stelweck, supra,* 86 B.R. at 846. *Accord, e.g., In re Fitzgerald,* 73 B.R. 923, 926 (Bankr.E.D.Pa.1987). The term "fraudulent" or any variant thereof does appear at one point in the district court decision, slip op. at 4, page 664 *supra,* but only in the context of describing the Plaintiffs' allegations rather than the court's rendering an actual finding of "fraud." *See also Butler,* 86 B.R. at 832–33 (finding of "constructive fraud" is insufficient to meet the requirements of § 523(a)(2)(A)). There is hence an unwillingness of the district court to find the kind of calculated actions on the part of the Debtors which would be necessary to support a cause of action under § 523(a)(2)(A). Unlike the issue concerning the district court's characterization of the type of fiduciary relationship involved, neither the record nor clear precedent aids the Plaintiffs on this score. They therefore simply fall short of proving the most essential element of a § 523(a)(2)(A) action, *i.e.,* fraud.

In similar fashion, the district court refrains from utilizing the term "embezzlement." As the Plaintiffs concede, an element of embezzlement is a *"fraudulent* appropriation of another's property," *In re Shinew,* 33 B.R. 588, 592 (Bankr.N.D.Ohio 1983) (emphasis added). *See also, e.g., In re Kelly,* 35 B.R. 640, 642 (Bankr.S.D.Fla. 1983). As indicated in the last paragraph, the Plaintiffs came up short in meeting the requisite "clear and convincing" standard that is generally necessary to support the conclusion that certain conduct is fraudulent. *See In re Garcia,* 88 B.R. 695, 699–702 (Bankr.E.D.Pa.1988). Thus, the Plaintiffs are unable to succeed in their challenge to dischargeability of their obligations on the ground that they constituted embezzlement.

The Plaintiffs' claim under § 523(a)(6) is, substantively, far more appealing. Although the district court does not dwell on the term "conversion," it must be recalled that the count of the Complaint in this proceeding upon which the district court rendered summary judgment was Count II, which alleged a cause of action for *conversion.* A conversion may be within the scope of "willful and malicious injury by the debtor ... to the property of another entity" envisioned by § 523(a)(6). *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.,* 783 F.2d 480, 486 (5th Cir.1986). *See also, e.g., Chrysler Credit Corp. v. Rebhan, Inc.,* 842 F.2d 1257, 1264 (11th Cir.1988); *In re Holtz,* 62 B.R. 782, 785 (Bankr.N.D.Iowa 1986); and *In re Conner,* 59 B.R. 594, 595–97 (Bankr.W.D.Mo.1986).

The Plaintiffs created an otherwise avoidable hurdle for themselves by not introducing their § 523(a)(6) claim until well after July 13, 1989, when the matter was submitted, and not, in fact, until the very last stages of the parties' briefing. However, the text and substance of the amendment sought, adding no further factual allegations and adding merely an invocation of § 523(a)(6) to the Complaint, would appear allowable in light of the liberality to allowance of amendments to pleadings expressed in B.Rule 7015 and Federal Rule of Civil Procedure 15(a). Such an amendment, alleging no additional factual averments to a paper record which has been closed, should be permissible, even if made after the general period for filing objections to discharge under B.Rule 4007(c). *See In re Blewett,* 14 B.R. 840, 842 (BAP 9th Cir.1981); *In re Krank,* 84 B.R. 372, 375–76 (Bankr.E.D.Pa.1988) (per TWARDOWSKI, CH. J.); *In re Kelley,* 46 B.R. 63, 65–68 (Bankr.E.D.Va.1985); and *In re Klein,* 31 B.R. 947, 950–52 (Bankr.E.D.N.Y. 1983). Amendments sought after the B.Rule 4007(c) time-period have been denied when accompanied by (1) the inability of the plaintiff to articulate a clear cause of action in even the proposed amended pleadings, *see In re Mart,* 90 B.R. 556, 558 (Bankr.S.D.Fla.1988); and *In re Ksenzowski,* 56 B.R. 819, 828 (Bankr.E.D.N.Y.1985); (2) extreme dilatory conduct on the part of the plaintiff, *see In re Tacoma Boatbuilding Co.,* 81 B.R. 248, 260 (Bankr.S.D.N.Y. 1987); and *In re Tester,* 53 B.R. 97, 99 (Bankr.W.D.Va.1985); or (3) an attempt to effect substantial changes to the original complaint. *See In re Herrera,* 36 B.R. 693, 694–95 (Bankr.D.Colo.1984) (changes effecting clarifications and amplifications of

original complaint permitted; however, an attempt to insert allegations concerning a different transaction or occurrence than that originally alleged in the complaint is denied). However, none of these circumstances appear to exist here.

Therefore, we would most probably have allowed the Plaintiffs to amend their Complaint to add a probably-successful Count under § 523(a)(6) were we not prepared to rule in their favor on the basis of the claim which they have already clearly articulated and argued based on defalcation under § 523(a)(4). It seems inappropriate, however, to grant the Plaintiffs leave to amend their Complaint when they have succeeded on grounds recited in their original Complaint. We shall therefore dismiss the Plaintiffs' outstanding motion to amend their Complaint as moot.

## J. CONCLUSION

A judgment declaring the Debtors' obligations to the Plaintiffs non-dischargeable on the sole basis of the Plaintiffs' claims based on defalcation under 11 U.S.C. § 523(a)(4) will be entered.