In re Irvin FELDMAN d/b/a Irvin Feldman Real Estate, Debtor.

John STONE, Plaintiff,

v.

Irvin FELDMAN, Defendant.

Bankruptcy No. 89–12900S.
Adv. No. 89–0958S.

United States Bankruptcy Court,
E.D. Pennsylvania.

March 12, 1990.

---

6. Page two of the debtor's counsel's Schedule of Time Expended mistakenly listed her 1987 hourly rate at $111.00.

Emil L. Iannelli, Southampton, Pa., for debtor.

Anthony Barone, Philadelphia, Pa., Trustee.

James H. Gorbey, Jr., Media, Pa., for The Frankford Trust Co.

Allan K. Marshall, Philadelphia, Pa., for plaintiff.

Stephen Raslavich, Philadelphia, Pa., for trustee.

## ADJUDICATION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. FINDINGS OF FACT

1. The Defendant in this proceeding, IRVIN FELDMAN (hereinafter "the Debtor"), filed the voluntary Chapter 7 bankruptcy case underlying this proceeding on August 7, 1989.

2. On October 17, 1989, the Plaintiff in this proceeding, JOHN STONE (hereinafter "the Plaintiff"), filed this matter, alleging that certain indebtednesses of the Debtor to him were non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4), and that the Debtor should be denied a discharge pursuant to 11 U.S.C. § 727(a)(3).

3. Most of the testimony at the trial, conducted on March 1, 1990, was adduced

from the Plaintiff's girlfriend, Kathryn Righter (hereinafter "Righter"), and from the calling of the Debtor as of cross-examination by the Plaintiff's counsel.

4. The Debtor, who appeared in his 60's and presented himself passively in the face of the overly-aggressive demeanor of the Plaintiff's counsel, testified that he was formerly involved in a real estate business in his own name for about 10 years, became a licensed real estate broker in 1982, and was no longer in business.

5. On October 11, 1985, the Debtor, on behalf of his real estate business, as agent for JIBA Corporation, entered into a Lease of a premises at 2417 East Firth Street, Philadelphia, Pennsylvania (hereinafter "the Premises"), to both the Plaintiff and Righter as tenants. The Lease term was one year, renewable month to month, at a rental of $200 monthly. Added as Special Clauses to the Lease were the following:

Tenant [sic] agrees [sic] to buy and sell.ers agree to sell the above property for $25,000, when is [sic] the tenant has paid $2,500 at $300 or more per motn [sic] into the escrow account, the mortgage would then be $21,900 to be placed with a lending institution. Tenant [sic] further agrees that all repairs will be done ot [sic] their expense.

6. On December 16, 1985, an Agreement of Sale of the Premises for $26,000 between "Registered Owner of Record" and the Plaintiff only, on which the Debtor's business was listed as "agent for the seller & escrow agent" was executed. This Agreement recited that $1,000 was paid at time of its signing, $1,000 more was to be paid within 30 days, and that settlement was to take place on or before February 28, 1986. The printed form, provided by the Debtor, included a clause stating that the sale was contingent upon the buyer's obtaining a mortgage commitment, but none of the blanks included in the "mortgage contingency" clause portion of the form, which it was contemplated would recite the type, amount, or term of the projected mortgage, were filled in.

7. Righter produced 18 receipts for payments between October 4, 1985, and May 12, 1987, all but two of which were signed by the Debtor personally and the remainder of which were signed by a person identified as his agent.

8. The payments which were designated for rent or were not designated as to purpose but were in the amount of $200 (the monthly rent and thus presumably rent payments) total $2,300. Payments designated as "deposit" or "escrow" in this period total $2,150.

9. Righter and the Debtor agree that the Debtor assisted the Plaintiff and/or Righter in filing about a half dozen mortgage applications, all of which were unsuccessful due to the poor credit record of the Plaintiff and the non-existent credit record of Righter.

10. The Debtor testified that, because of the inability of the Plaintiff and Righter to get a mortgage and because he was a co-owner of the Premises, he offered to provide his own purchase-money mortgage to the Plaintiff and Righter to buy the Premises. Righter testified that she understood that the Debtor offered only to buy the property in his own name and give it to the Plaintiff and Righter when they paid him off, which offer Righter testified that she declined because she feared that, if the aged Debtor died before they paid him off, his heirs would get the property.

Due to the complete lack of sophistication of the Plaintiff and Righter in such matters, we believe that the Debtor did make an offer to provide a purchase-money mortgage, but that Righter and the Plaintiff misunderstood the nature of the offer and unwittingly rejected it. No papers to reflect any such mortgage were consequently ever prepared by the Debtor.

11. The Debtor and Righter agree that the Plaintiff and Righter offered to make a lump-sum payment towards the purchase price when the Plaintiff recovered certain sums due on a claim arising from a work-related injury, and that the Debtor suggested that the availability of a large sum from this recovery, as a down payment, might allow the Plaintiff to obtain a mortgage.

12. Shortly after he obtained a sum in excess of $10,000 from his injury claim, the Plaintiff, on March 21, 1988, deposited $8,000 with the Debtor toward the purchase of the Premises.

13. The Debtor testified that he again attempted to obtain a mortgage for the Plaintiff and Righter, without success, even after receipt of the $8,000 payment.

14. Righter testified that, shortly after the deposit of the $8,000 with the Debtor, she was unable to locate him. After some investigation, she testified that she did locate him and that he advised her that he had sold the Premises to third parties. She and the Plaintiff then demanded the return of the $8,000. It is not clear whether Righter and the Plaintiff demanded any additional sums.

15. The Debtor testified that he used some of the $8,000 to make unspecified repairs to the Premises. However, he also admitted that he used the money for "various things" not related to the Premises. He produced no written or even oral accounting of the disposition of the $8,000.

16. The Debtor testified that the Plaintiff and Righter began a campaign of harassing, threatening, and pressuring him to return the $8,000. Indeed, Righter stated that she "camped out" at the Debtor's home and office and that she and the Debtor had confrontations which "got nasty sometimes."

17. In April, 1989, the Debtor presented two checks to the Plaintiff and Righter, dated April 11, 1989, in the amount of $2,000, and April 19, 1989, in the amount of $6,000, to repay the $8,000 deposit. The Debtor admitted that he knew that these checks would not be covered by funds in the accounts on which they were drawn and that he did not intend to pay the Plaintiff the $8,000 when he wrote the checks, but that he nevertheless remitted these checks to Righter and the Plaintiff simply to get them "off his back." The checks were, as might be expected, unpaid.

18. At the time that he drew these checks, the Debtor was in the midst of a Chapter 13 bankruptcy case, filed in this court on September 19, 1988, subsequently dismissed, and closed on July 26, 1989, prior to the institution of the instant Chapter 7 case. The Debtor's "payments" of April, 1989, to the Plaintiff were not disclosed to the Trustee or to this court.

19. No evidence was presented that either the Debtor or the Plaintiff and Righter terminated the Lease of October 11, 1985, or agreed to modify any of the conditions thereof.

20. Although subsequent to March 21, 1988, she produced only one receipt, dated December 10, 1988, for a $400 rental payment, Righter testified that she and the Plaintiff continued to pay rent for the Premises until February, 1989, at which time a defect to the chimney of the Premises requiring repairs of about $1,000 was discovered. The Plaintiff and Righter believed that the Debtor was obligated to make these repairs, which he did not undertake to do, and they were unable to afford them. They therefore ceased paying rent and vacated the Premises in June, 1989.

21. Despite the Plaintiff's vigorous attempts to obtain same through discovery, and orders of this court of January 17, 1990, and January 31, 1990, directing him to produce same, the Debtor never provided the Plaintiff with copies of the statements from his checking accounts nor a statement of the identity of the owner(s) of the Premises at present. The Debtor testified that all of his own copies of his bank records and other records were destroyed in a flood at his home and that his banks were unable to produce copies of the checks over the period from January 17, 1990, until the date of trial. We find that lack of compliance with our Orders inexcusable and indicative of an attempt of the Defendant to conceal pertinent information from the Plaintiff.

### B. CONCLUSIONS OF LAW

1. The Plaintiff withdrew his cause of action under 11 U.S.C. § 727(a)(3) in a colloquy at the close of the trial, and therefore we need not consider any challenge to the Debtor's obtaining a discharge. The Plaintiff's remaining causes of action challeng-

ing the dischargeability of his particular indebtedness are based upon 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4), which provide as follows:

§ 523.  Exceptions to discharge

(a) A discharge under section 717, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.     .     .     .     .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;  ...

.     .     .     .     .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;  ...

■ 2.  In order to prevail in an action pursuant to 11 U.S.C. § 523(a)(2)(A), the Plaintiff was obliged to prove each of the five following elements by "clear and convincing" evidence:

(1) that the debtor made the representation;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;  and

(5) that the creditor sustained the alleged loss and damage as a proximate result of the representations having been made.

*In re Cirineo, Manufacturers Hanover Trust Co. v. Cirineo,* 110 B.R. 754, 757–58 (Bankr.E.D.Pa.1990); *In re Bergman,* 103 B.R. 660, 671 (Bankr.E.D.Pa.1989); and *In re Stelweck,* 86 B.R. 833, 846 (Bankr.E.D. Pa.1988), *aff'd sub nom. United States v. Stelweck,* 108 B.R. 488, 493 (E.D.Pa.1989).

3.  The Debtor admitted that he implicitly represented to the Plaintiff that the checks in the total amount of $8,000, which he presented to Righter, were good for payment;  that he knew that the checks

were in fact not good;  and that he presented the checks to Righter with the intention of deceiving Righter and the Plaintiff so that he could at least temporarily avoid their efforts to collect these sums from him.  The Plaintiff, by attempting to cash the checks, indicated that he relied upon the Debtor's representation that the checks were good, and he suffered a monetary loss as a direct result when he learned that they were worthless.  Therefore, all the elements for a successful cause of action pursuant to § 523(a)(2)(A) are satisfied as to the negotiation of these checks.  The Debtor's knowledge that the checks would not be honored distinguishes this case from such cases as *In re Hunter,* 83 B.R. 803, 804 (S.D.Fla.1988);  *In re Tuggle,* 86 B.R. 612, 615 (Bankr.E.D.Mo.1988);  and *In re Roberts,* 82 B.R. 179, 182–84 (Bankr.D. Mass.1987), and renders it, as to this aspect, indistinguishable from our previous decision in *In re Bouie, Presley v. Bouie,* Bankr. No. 87–05723S, Adv. No. 89–0023S, 1989 WL 47339 (Bankr.E.D.Pa. May 4, 1989).

4.  The Debtor's apparent contention that the $8,000 checks were drawn under duress on account of an unmeritorious obligation must be rejected for two reasons. Firstly, as we indicated at Conclusions of Law 5–8, pages 485–87 *infra,* we believe that the Debtor did owe the Plaintiff the $8,000, and that this underlying obligation was nondischargeable under 11 U.S.C. § 523(a)(4) also.  Secondly, this contention would not overcome the Plaintiff's justified claim that the Debtor made false pretenses and made a false representation to the Plaintiff by presenting Righter and him with what the Debtor *knew* was a bad check.

■ 5.  As we noted in *Bergman, supra,* 103 B.R. at 667, in an action based upon 11 U.S.C. § 523(a)(4), the plaintiff is obliged to prove the requisite fiduciary capacity in which the Debtor is acting by "clear and convincing evidence," but need prove the defalcation itself by only the preponderance of the evidence.  *Accord, In re James,* 94 B.R. 350, 352 (Bankr.E.D.Pa. 1988) (FOX, J.);  and *In re Borbidge,* 90

**486**

B.R. 728, 733 (Bankr.E.D.Pa.1988) (FOX, J.). Furthermore, the fiduciary capacity in which the Debtor is acting must arise from an express trust and not from a trust *ex maleficio* which arises solely due to the fact that the Debtor's wrongful act occasioned the indebtedness. *See Bergman, supra,* 103 B.R. at 667; *James, supra,* 94 B.R. at 352; *In re Ramonat,* 82 B.R. 714, 719 (Bankr.E.D.Pa.1988) (TWARDOWSKI, CH. J.); and *In re Lane,* 76 B.R. 1016, 1022 (Bankr.E.D.Pa.1987). However, the requisite "express trust" may arise as a matter of law as well as from a particular trust instrument. *See In re Long,* 774 F.2d 875, 878 (8th Cir.1985); and *Bergman, supra,* 103 B.R. at 668–70.

6. The relationship of the parties was, at all times prior to December 16, 1985, and at all times subsequent to February 28, 1986, governed solely by the Lease of October 11, 1985. The Agreement of Sale expired on its own terms when settlement did not occur on February 28, 1986.

■ Contrary to the arguments of the Debtor, the Agreement of Sale must be construed as containing an enforceable mortgage contingency clause even though the type of mortgage, amount, and term were not filled in on the blank spaces on the form's clause providing for same. We would conclude that such a clause was excluded from a form on which it appears only if it were crossed out. It must be recalled that the printed Agreement of Sale form was presented by the Debtor-broker to totally unsophisticated buyers and that therefore any ambiguities in this contract must be construed against the party supplying the contract form, *i.e.,* the Debtor. *See, e.g., In re Franks,* 95 B.R. 346, 350–51 (Bankr.E.D.Pa.1989); *In re Jordan,* 91 B.R. 673, 678–79 (Bankr.E.D.Pa.1988); and *In re United Nesco Container Corp.,* 68 B.R. 970, 974 (Bankr.E.D.Pa.1987). An interpretation of this contract which excluded the mortgage contingency would appear clearly contrary to the parties' course of dealing and unconscionable, as well as constituting an impermissible, sharp interpretation of an ambiguity in the contract in favor of the Debtor.

■ 7. Under the Lease, the Debtor was obliged to place all of the payments made to him towards the purchase-option aspect of the Lease into an "escrow account." Any party who is a depositary under an escrow agreement is obliged to retain the sums or property placed in escrow until the happening of a designated condition, at which time the sums deposited are to be paid to the grantee, promisee, or obligee. *See, e.g., In re 222 Liberty Associates, 222 Liberty Associates v. Prescott Forbes Real Estate Corp.,* 110 B.R. 196, 201 (Bankr.E.D.Pa.1990). The failure of the depositary to meet the terms of this undertaking constitutes a conversion and renders the depositary liable to indemnify the principal. *Id.* at 201–02. Furthermore, the obligation of a real estate broker to account to the depositor for funds deposited with him in escrow is mandated by state law. 63 P.S. §§ 455.604(a)(5)(i), (iii), (iv), (v).

■ The Debtor was, by the terms of the Lease, identified as the escrow agent to hold the funds paid to him by the Plaintiff and Righter towards the purchase of the Premises as a depositary upon the condition of the occurrence of a sale, at which time he was obliged to pay the sums deposited to JIBA Corporation, or whoever were the owners of the Premises. He was not entitled to invade the sums deposited in escrow for any other purpose, including the payment of even his own possibly legitimate expenditures to repair the Premises. *Compare 222 Liberty Associates, supra,* at 202–03.

We have little doubt that a depositary under an escrow agreement and, particularly, a real estate broker acting in the capacity as a depositary, is occupying a fiduciary relationship as to the depositor. Other decisions of this court have expressly so held. *See In re Wolfington,* 48 B.R. 920, 923–24 (Bankr.E.D.Pa.1985); *In re Wolfington,* 47 B.R. 762, 764–66 (Bankr.E.D.Pa.1985); and *In re Leonetti, Community Title Abstract Co. v. Leonetti,* Bankr. No. 81–00772K, Adv. No. 82–2802K (Bankr.E.D.Pa. March 23, 1983). Courts elsewhere have concurred. *See, e.g., Hamby v. St. Paul Mer-*

*cury Indemnity Co.*, 217 F.2d 78, 80–81 (4th Cir.1954); *In re Currin*, 55 B.R. 928, 932–35 (Bankr.D.Colo.1985); and *In re Lawrence*, 10 B.R. 853, 855–56 (Bankr.E.D. Va.1981).

8. The sums which the Debtor received from the Plaintiff in the nature of "deposits" and "escrows" were hence funds received by the Debtor while acting in a fiduciary capacity. His admitted failure to repay those sums to the Plaintiff, or even account for same, constitutes a defalcation. *Compare Bergman, supra*, 103 B.R. at 669, 670.

9. While we ordinarily confine ourselves, in the context of deciding a dischargeability proceeding instituted, as here, in a no-asset Chapter 7 case, to declaring an obligation dischargeable or nondischargeable, and relegating liquidation of the obligation to non-bankruptcy forums, *see, Stelweck, supra*, 86 B.R. at 844–45, when a portion of certain payments or potential obligations must be allocated between those that are dischargeable and those that are nondischargeable, it is necessary to address the specific amount of the obligation which is nondischargeable. *See Cirineo, supra*, 110 B.R. at 763; and *In re Mann, Mann v. Mann*, Bankr. 88–13729S, Adv. No. 89–1045S, slip op. at 5–7, 1990 WL 5317 (Bankr.E.D.Pa. Jan. 26, 1990).

Here, the Plaintiff has remitted payments towards both the rental of the Premises and deposits toward the purchase of the Premises to the Debtor over the same time-period. Although the Complaint seems to demand that all payments made to the Debtor by the Plaintiff should be deemed nondischargeable debts of the Debtor to the Plaintiff, clearly the payments made for rent did not create debts and do not fall into this category.[1] Only the payments allocated to "deposit" or "escrow," which amounted to $2,150, through March 21, 1988, *see* Finding of Fact 8, page 483 *supra*, plus the $8,000 payment on March 21, 1988, fit into this category.

Therefore, we conclude that the Debtor's obligation to the Plaintiff in the amount of $10,150 is nondischargeable under § 523(a)(4), as to him only.[2] As we indicated in Conclusion of Law 4, page 485 *supra*, $8,000 of this sum is also nondischargeable, again as to the Plaintiff only, under § 523(a)(2)(A).

## C. ORDER

AND NOW, this 12th day of March, 1990, after a trial of March 1, 1990, of the within adversary proceeding, it is hereby ORDERED as follows:

1. Judgment is entered in part in favor of the Plaintiff, JOHN STONE, and against the Defendant, IRVIN FELDMAN, in the above-entitled adversary proceeding.

2. As a result, the liabilities of the Debtor to the Plaintiff arising from payments made by the Plaintiff towards a deposit or escrow for the purchase of the premises situates at 2417 East Firth Street, Philadelphia, Pennsylvania, in the total amount of $10,150.00, are declared to be nondischargeable debts under 11 U.S.C.

---

1. We note that, contrary to the position of the Plaintiff and Righter, this Lease, and its concomitant placing of an obligation on the tenants to make repairs, remained in effect at all times due to the failure of either party to terminate it, or of the parties to modify it. The Debtor therefore may continue to have a viable claim against the Plaintiff and Righter for unpaid rents. In his Answer, however, the Debtor did not clearly plead the affirmative defense of setoff, nor did he plead a counterclaim. *See* 2A J. MOORE, FEDERAL PRACTICE, ¶ 8.27[3], at 8–191 to 8–192 (2d ed.1989) (setoff must be pleaded as either an affirmative defense or as a counterclaim). In any event, we doubt whether the Debtor could set off his claims as landlord or agent for the landlord for rent owed against the Plaintiff's claims arising out of the Debtor's breach of fiduciary duties as the depositary under an escrow agreement. *See 222 Liberty Associates, supra*, 110 B.R. at 203–04.

2. We emphasize that the debt is nondischargeable only as to the Plaintiff because he is the only party plaintiff to this proceeding, and the bar date for other parties' filing of non-dischargeability complaints has passed. Since we conclude that the Debtor's liability under § 523(a)(4) arose under the Lease of October 11, 1985, to which Righter was a party obligee, she also would appear to have had the same rights as the Plaintiff to have had the sums deposited in escrow declared nondischargeable debts. However, it is now too late for her to assert such rights.

§ 523(a)(4). Further, $8,000 of this liability is alternatively declared to be a nondischargeable debt under 11 U.S.C. § 523(a)(2)(A).

3. It appearing that no further matters are pending in this bankruptcy case, in the event that no appeal from this Order is filed on or before March 16, 1990, the Clerk shall prepare a Discharge Order, and after its execution, shall close the files of both the Debtor's main bankruptcy and this adversary proceeding.[3]

---

**3.** This directive is intended to serve the same end as our Order of October 18, 1989, in which we denied motions of Frankford Trust Co. to dismiss this case and obtain relief from the automatic stay: prompt completion of its administration to minimize any unfair prejudice to Frankford Trust Co.