In re Harry S. EBERHART, Debtor.

First American Title Insurance
Company, Plaintiff,

v.

Harry S. Eberhart, Defendant.

Bankruptcy No. 95–31694.
Adversary No. 95–3086.

United States Bankruptcy Court,
D. Connecticut.

Sept. 13, 2002.

98

Julie A. Manning, Esq., Shipman & Goodwin, Hartford, CT, for Plaintiff.

Susan M. Williams, Esq., Grafstein and Associates, Farmington, CT, for Defendant.

## MEMORANDUM OF DECISION ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

At issue in this adversary proceeding is the dischargeability a debt owed to the Plaintiff as a result of the Debtor's misconduct as an escrow agent in connection with a mortgage refinance transaction. For the reasons which follow, the subject debt is deemed to be non-dischargeable.

### II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this proceeding on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)($l$).

### III. FACTUAL BACKGROUND

1. On or about May 6, 1989, Judy and Joseph Zangari (hereafter, the "Zangaris") borrowed the sum of $45,500 from Mortgage Investment Associates, Ltd. (hereafter, "MIA"), for the purpose of refinancing a first mortgage (hereafter, the "First Mortgage") upon certain residential real estate located in the State of Florida (hereafter, the "Property") (transaction hereafter referred to as the "Refinance Transaction").

2. The First Mortgage was held by Ralz and Dorothy Taylor (hereafter, the "Taylors"). At the time of the Refinance

Transaction the pay-off amount on the First Mortgage significantly exceeded the net amount of proceeds which would be made available to the Zangaris from MIA through the Refinance Transaction.

3. The Debtor–Defendant, Harry S. Eberhart (hereafter, "Eberhart"), was the attorney for the Zangaris in connection with the Refinance Transaction. Eberhart was also a personal friend and real estate business associate of the Zangaris, although he apparently had no direct financial interest in the Property.

4. At the time of the Refinance Transaction Eberhart was a member of the bar of the States of Connecticut and Florida, and had been involved in several hundred refinance transactions during his tenure as a real estate attorney. Also at that time he was a title insurance agent for the Plaintiff, First American Title Insurance Company (hereafter, "First American"), although not in connection with the Refinance Transaction.

5. MIA agreed to loan funds to the Zangaris on the condition that the loan proceeds would be used, *inter alia*, to satisfy the First Mortgage, resulting in MIA's accession to the first mortgage position on the Property.

6. Eberhart and MIA agreed that Eberhart would serve as an escrow agent for the Refinance Transaction. That is, he would receive into escrow sufficient funds to complete the Refinance Transaction, and then disburse those funds as necessary to complete the closing of the Refinance Transaction, most notably through satisfaction of the First Mortgage.

7. Prior to transmitting the Loan Proceeds to Eberhart as escrow agent, and in recognition of the fact that the pay-off amount on the First Mortgage significantly exceeded the net amount of loan proceeds that it would make available to the Zangaris through the Refinance Transaction (hereafter, the "Loan Proceeds"), MIA requested assurance (hereafter, the "Assurance") from Eberhart that he was holding sufficient funds in escrow to complete the Refinance Transaction, *i.e.* funds to add to the Loan Proceeds to enable payment of the First Mortgage and other closing costs (hereafter, the "Supplemental Funds").[1]

8. Following its receipt of the Assurance, and the Zangaris' execution of a Promissory Note, MIA transmitted Loan Proceeds to Eberhart's "Clients Funds Real Estate Account" in the amount of $42,603.00.

9. From the Loan Proceeds Eberhart made disbursements, in accordance with the directions of MIA, in payment of the usual and customary closing costs in connection with the Refinance Transaction. The substantial remaining balance was not disbursed as directed by MIA. Rather, it was paid by Eberhart *at the direction of the Zangaris,* as follows: (i) $17,222.66 to Keith Sabo—a creditor of the Zangaris; and (ii) $19,795.59 to J & J Real Estate—a business entity wholly owned by the Zangaris.

10. Notably, the Loan Proceeds were not utilized to satisfy and release the First Mortgage, resulting in MIA's occupation of a second mortgage position on the Property.

11. Due to a continuing default by the Zangaris under the First Mortgage, the Taylors commenced a civil action in Florida seeking, *inter alia,* a foreclosure of the First Mortgage. In that action, styled

---

1. At one point in time, the Zangaris had negotiated a discounted pay-off amount with the Taylors. Nonetheless, even that discounted amount would have required Supplemental Funds to complete the Refinance Transaction.

*Taylor v. Zangari, et al.*, Case No. 89–1085–CA–01, in the Circuit Court of the Fifth Judicial Circuit in and for Hernando County, Florida, First American—a cross-claimant in that action [2]—filed a crossclaim against the Zangaris and Eberhart (hereafter, the "Crossclaim").

12. Eberhart filed an answer and counterclaim to the Crossclaim. However, on February 28, 1990, First American obtained a final default judgment against Eberhart on the Crossclaim in the amount of $49,471.43 (hereafter, the "Florida Judgment"). Thereafter, alleging insufficient notice of hearing, Eberhart filed a Request to Reconsider the Florida Judgment, which was eventually denied by the Florida Circuit Court.

13. On or about December 23, 1992, the Connecticut Superior Court domesticated the Florida Judgment and entered a judgment in favor of the Plaintiff in the total amount of $61,632.39 (hereafter, the "Connecticut Judgment").

14. On September 5, 1995, Eberhart filed a Chapter 7 petition with this Court. On December 1, 1995, First American commenced the instant adversary proceeding against Eberhart to determine the dischargeability of the subject debt. Specifically, First American asserts that Eberhart's debt to it should be deemed nondischargeable pursuant to the provisions of 11 U.S.C. §§ 523(a)(2)(A), (4), and (6).

## IV. DISCUSSION

■ Congress has determined that under limited circumstances, individual creditors' interests in recouping certain classes of debts outweigh a debtor's interest in the unqualified fresh start implied by a general discharge. *See Grogan v.*

*Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are, however, to be narrowly construed in favor of the debtor. *E.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir.1996). Under the various subsections of Code Section 523(a) the creditor bears the burden of establishing the nondischargeability of its debt by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 291, 111 S.Ct. 654.

### A. Section 523(a)(4).

Under the terms of Code Section 523(a)(4), a debt is excepted from a debtor's general discharge if such debt is "for fraud or *defalcation* while acting in a *fiduciary capacity* . . . ." (emphasis supplied).

#### 1. Fiduciary Capacity.

■ The concept of "fiduciary capacity" is one ultimately determined by federal law, although state law is relevant to the inquiry. *E.g., Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir.1996). Among the relationships which produce "fiduciary capacity" is an *express* trust. *Id.*

■ An express trust is initiated by one entity's transfer of property to another entity coupled with a manifestation of an intention to create a trust. *See* Restatement (Second) of Trusts §§ 2, 23 (1959); *cf. Marzahl v. Colonial Bank & Trust Co.*, 170 Conn. 62, 64, 364 A.2d 173 (1976); *Goytizolo v. Moore*, 27 Conn.App. 22, 25, 604 A.2d 362 (1992). A trust may be created even though the first entity—the "settlor"—does not use the word "trust." Restatement (Second) of Trusts § 24 cmt. b. And although the intention of the settlor must be "externally expressed", *id.* at cmt.

2. At this point in time First American—MIA's title insurer—had succeeded to the interest of MIA, presumably through subrogation after the payment of a title insurance claim.

c, it need not be evidenced by words, whether written or spoken; it may be discerned solely from the conduct of the settlor in light of all the circumstances, *id.* at § 4 cmt. a, § 24(1). Once a settlor has tendered the subject property to the intended trustee and manifested an intention to create a trust, the intended trustee then accepts or disclaims the trust. Whether the intended trustee accepts or disclaims depends, again, upon a manifestation of intention. *Id.* at § 102 cmt. c. No particular formality is necessary to constitute an acceptance, *id.* at § 102 cmt. b; indeed, it is a question of fact in each case whether the intended trustee has manifested an intention to accept or disclaim. *Id.* at § 102 cmt. c. Even acts occurring subsequent to a manifestation of an intent can be relevant to a court's determination of whether an intended trustee accepted or disclaimed a trust. *See id.* at § 2.

■ The Court concludes from the entire evidentiary record in this proceeding that an express trust was created when MIA transmitted, and Eberhart accepted, the Loan Proceeds as an escrow agent. The conduct of MIA and Eberhart amply demonstrates their respective intention and acquiescence to a transfer of the Loan Proceeds to be maintained by Eberhart in a fiduciary capacity.

This conclusion is consistent with the decisions of other bankruptcy courts which have found escrow agents to be serving in a fiduciary capacity. *E.g., Stone v. Feldman (In re Feldman)*, 111 B.R. 481, 486 (Bankr.E.D.Pa.1990); *Berry v. Mullin (In re Mullin)*, 91 B.R. 175, 177 (Bankr. S.D.Fla.1988).

The Court's conclusion is further supported by Connecticut law, *e.g., Kallas v. Harnen,* 1996 WL 285539 at *4 (Conn.Super. May 10, 1996) ("an escrow agent is a fiduciary . . . ."), and the general common-law, *see, e.g.,* 28 Am.Jur.2d, *Escrow* § 11

("It has been held that, strictly speaking, the [escrow] depositary is not an agent at all, but rather the trustee of an express trust . . . ."); Restatement (Second) of Trusts § 32 cmt. a ("A trust may arise where there is a delivery in escrow.").

Of additional relevance is the fact that the Loan Proceeds were deposited into, and disbursed from, a "Clients Fund Account." Eberhart's use of such an account is at least ostensibly consistent with the fiduciary requirements imposed upon Connecticut attorneys when handling the monetary property of others. *See, e.g.,* Conn. Sup.Ct. R. § 2–28(b).

### 2. Defalcation.

■ Having determined that Eberhart was acting in a fiduciary capacity in connection with the Refinance Transaction, the Court turns next to the conduct element of the fiduciary misconduct aspect of Section 523(a)(4)—*i.e.* the requirement that there be a "fraud" or "defalcation." Since the record does not support by a preponderance of the evidence that Eberhart was engaged in a conscious fraud, this Court limits its inquiry to the question of whether his conduct amounted to a defalcation.

■ As with the concept of "fiduciary capacity", the determination of a "defalcation" is ultimately a question of federal law, although state law will often be of relevance. *See The Andy Warhol Foundation for Visual Arts. v. Hayes (In re Hayes)*, 183 F.3d 162, 166 (2d Cir.1999). Neither the Bankruptcy Code nor its legislative history defines "defalcation." Plainly though, the term implies at least a failure to maintain the subject trust. The more challenging question is what level of trustee *mens rea* must attend that loss. Certainly, a defalcation may be found under circumstances demonstrating less than

criminal or fraudulent intention. This conclusion springs directly from the act of statutory construction, perhaps most eloquently summarized by Judge Learned Hand under the Bankruptcy Act, to wit:

> Colloquially perhaps the word, 'defalcation,' ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts .... Whatever was the original meaning of 'defalcation,' it must have covered other defaults than deliberate malversations, else it added nothing to the words, 'fraud or embezzlement.'

*Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510, 511 (2d Cir.1937). Indeed it is a fair question whether a defalcation under Section 523(a)(4) requires any mal-intent or misconduct at all. In *Herbst*, Judge Hand "assume[d] *arguendo*" that some "misconduct" was required. However, this Court need not struggle with that question since there is ample evidence in the record of this proceeding to establish Eberhart's misconduct in exercising his duties as an escrow agent for the Refinance Transaction. In short, Eberhart was, at best, *reckless* in releasing a substantial portion of the Loan Proceeds at the direction of the Zangaris where those disbursements did not satisfy the First Mortgage as directed by MIA. As a real estate attorney with vast experience in mortgage refinance transactions, Eberhart certainly understood that MIA would not have provided the Loan Proceeds on any condition other than the satisfaction and release of the First Mortgage.

It may well be that Eberhart's social and business relationship with the Zangaris led to his amenability to breach his trust with MIA. Regardless of the level of confidence Eberhart may have reposed in the Zangaris, in light of the nature of the transaction and the fiduciary role accepted by him, it was reckless to have disbursed the Loan Proceeds on instructions from the Zangaris.

In his post-trial brief Eberhart argues essentially that even if this Court finds some misconduct in a fiduciary capacity, he may still be absolved since Section 523(a)(4) carries an implicit requirement that the debtor have personally benefitted from any misconduct. In support of this proposition Eberhart cites *Wachovia Bank and Trust Company, N.A. v. Banister (In re Banister)*, 737 F.2d 225, 228 (2d Cir. 1984), a panel decision of the United States Court of Appeals for the Second Circuit which, he claims, "unequivocally ruled that in order to establish a defalcation of fiduciary duty, the trustee must have personally benefited [sic] from the misappropriated funds."

Unfortunately for his position, Eberhart reads *Banister* too broadly. A careful reading of that Bankruptcy Act opinion reveals that any requirement of personal benefit is not applicable to instances, such as these, involving "funds expressly required to be held segregated for the creditor's benefit", *i.e.* an express trust. *Id.*, at 229 (*citing In re Folliard*, 10 B.R. 875 (D.Md.1981)). *Folliard* draws the appropriate distinction between express trusts and other relationships with regard to a debtor's personal benefit. 10 B.R. at 877–78.

Because this Court has found the existence of an express trust relationship between Eberhart and MIA, it need not attempt to discern from the record whether or not Eberhart converted the Loan Proceeds to his own benefit, or otherwise personally benefitted from his misconduct with respect to the Refinance Transaction. The occurrence of recklessness in a fiduciary capacity is sufficient to establish nondischargeability under Section 523(a)(4).

## B. Sections 523(a)(2) and (6).

Because the Court's findings and conclusions with respect to Code Section 523(a)(4) compel that the subject debt be adjudged non-dischargeable, it is unnecessary for the Court to consider dischargeability under the alternatively-pled bases of Sections 523(a)(2)(A) and 523(a)(6).

## V. CONCLUSION

For the foregoing reasons a judgment shall enter pursuant to Bankruptcy Code Section 523(a)(4), declaring as non-dischargeable the indebtedness of Eberhart to First American arising from the Refinance Transaction.