IN RE: David RACHEL, Debtor.

Caitlin Energy, Inc., Plaintiff,

v.

**David P. Rachel, Defendant.**

**CASE NO. 13–75423–WLH**
**ADV. PROC. NO. 14–5044**

United States Bankruptcy Court,
N.D. Georgia, Atlanta Division.

Signed March 17, 2015

Scott A. Schweber, Cohen Cooper Estep & Allen, LLC, Atlanta, GA, for Plaintiff.

Neville Francis, Atlanta, GA, for Defendant.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION TO STRIKE

Wendy L. Hagenau, U.S. Bankruptcy Court Judge

Plaintiff obtained a judgment against the Debtor in the Superior Court of Fulton County, and the Debtor has been convicted in the United States District Court for the District of Arizona of conspiracy to commit wire fraud and money laundering and of twelve counts of money laundering. Plaintiff seeks to use the state court judgment and the district court verdict to have its debt deemed non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(4). The Court has reviewed the Plaintiff's Motion for Summary Judgment and related Motion to Strike, the Debtor's responses thereto, the parties' briefs and submissions in connection therewith, and now enters this Order. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 as the matter seeks to determine the dischargeability of a debt. This adversary proceeding is core under 28 U.S.C. § 157(b)(2)(I) and the Court has authority to enter a final judgment herein.

### UNDISPUTED FACTS

The Defendant did not respond to the individually numbered Statement of Undisputed Facts as required by Local Rule 7056–1, but instead stated his own version of undisputed facts. The Court has reviewed both Statements of Undisputed Facts and concludes the following facts are undisputed. Caitlin Energy, Inc. ("Caitlin" or "Plaintiff") is a Canadian corporation which sought a loan for approximately $11 million to finance a solar project in Toronto, Ontario, Canada. Caitlin found Platinum Diversified Holdings, Inc. ("PDH") as a potential lender. As a precondition to obtaining the loan, Caitlin was required to enter into an escrow agreement among PDH, Caitlin and David P. Rachel, Attorney at Law ("Rachel" or "Debtor") and to deposit $330,000 into escrow with the Debtor. On September 27, 2010, Caitlin, Rachel and PDH executed the escrow agreement ("Escrow Agree-

ment"). The Debtor is identified as escrow agent, PDH is identified as lender, and Caitlin is identified as borrower. The Escrow Agreement recites that PDH and Caitlin have executed a letter of intent for $11 million "with respect to the funding of the development of several rooftop solar power generation systems". The Debtor does not dispute that funds in the amount of $330,000 were deposited by Caitlin with the Debtor as escrow agent on September 29, 2010, and that the funds were deposited into his IOLTA account. When funds were not received by Caitlin on any loan from PDH, Caitlin made several demands on the Debtor for return of the $330,000. None of the funds were returned because all but about $11,000 was disbursed from the IOLTA account on September 30, 2010.

On April 23, 2012, Caitlin filed a complaint in Fulton County Superior Court seeking a judgment against the Debtor for professional malpractice, breach of fiduciary duty, negligent misrepresentation, breach of contract and attorney's fees. On October 19, 2012, the Superior Court entered an order granting Caitlin's motion for sanctions, and striking the Debtor's answer and counterclaim due to discovery violations, including his failure to attend a deposition. A default judgment was entered against the Debtor on October 31, 2012, in the amount of $330,000 ("Superior Court Judgment").

About a year later, the Debtor and four other individuals were indicted in the District Court for the District of Arizona. In the indictment, the government alleged that Debra Ann Nickolas owned and operated PDH, which allegedly provided funding for large business projects. It was alleged that Nickolas and others identified "victims" around the world who were looking for loans to fund business projects. "Nickolas told these victims to send a re-

fundable deposit to a designated escrow agent who would hold the deposit as collateral until the loan funded." Superseding Indictment at 2 *United States v. Rachel,* et. al., No. CR–12–1927–PHX–NVW (D. Ariz. filed Oct. 8, 2013). The Debtor was identified as one of the escrow agents who would allegedly hold the deposit as collateral until the loan was funded. The indictment alleges specifically that the Debtor and others "falsely told victims that the refundable deposits would be held in escrow until the loans funded." *Id.* The indictment further alleges that none of the victims ever obtained funding for the business projects and their deposits were never refunded. The indictment states, "Instead of holding the refundable deposits in escrow ... Rachel disbursed the money to themselves and other co-conspirators and spent the money on luxury cars, vacations, interior design services, and other personal expenses. In some cases the refundable deposits were disbursed to the co-conspirators within days of being deposited." *Id.* The indictment alleges there were at least 15 different victims, and that the defendants collectively obtained over $10 million from those victims.

The Debtor was indicted on one count of conspiracy to commit wire fraud and money laundering and twenty counts of money laundering. The indictment includes numerous specific acts which the government contended constituted a crime, including, "On or about September 22, 2010, Rachel and another co-conspirator, D.C., falsely told victim CM. that the refundable deposit would stay in the escrow account and would only be disbursed after Rachel received funding from the loan." *Id.* at 4. This allegation matches the allegation contained in the affidavit of Claudiu Murgan [Docket No. 19], paragraph 12. Mr. Murgan's testimony and the transcript of the September 22, 2010 telephone call referenced in his affidavit and in the indictment

were used in the criminal case against the Debtor. After trial, a verdict was returned on October 8, 2014, finding the Debtor guilty of conspiracy to commit wire fraud and money laundering, and of 12 counts of money laundering ("Federal Court Verdict").

The Debtor filed his petition under Chapter 7 of the United States Bankruptcy Code on November 22, 2013. Caitlin filed this adversary proceeding timely on February 18, 2014, alleging that its claim of $330,000 is non-dischargeable under 11 U.S.C. §§ 523(a)(2) and (a)(4).

The Motion for Summary Judgment ("Motion") was filed by Caitlin and included the affidavit of Murgan as discussed above which attached numerous documents. The Debtor opposed the Motion and attached his own affidavit. Thereafter, Caitlin filed a motion to strike the Debtor's affidavit, alleging the notary signature on the affidavit was forged. The Debtor submitted additional information, which Caitlin alleged was not timely filed.

### MOTION TO STRIKE

The Court will first address Caitlin's Motion to Strike [Docket No. 27]. A motion to strike is filed pursuant to Fed. R. Civ. P. 12 incorporated in the Bankruptcy Rules at Fed. R. Bankr. P. 7012. This rule provides, "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Motions to strike are generally disfavored. *Juniper Networks, Inc. v. Palo Alto Networks, Inc.*, 881 F.Supp.2d 603, 605 (D.Del.2012) (citations omitted). "When ruling on a motion to strike, the [c]ourt must construe all facts in favor of the non-moving party". *Id.* (alteration in original) (citations omitted).

Caitlin contends it is "highly probable" the notary did not execute the affidavit and that her signature was forged. In support of the Motion to Strike, Caitlin attached a report from Farrell Shiver, a certified forensic document examiner, who purportedly examined various signatures of the notary. Mr. Shiver concluded it was "highly probable" the notary did not write her signature on the affidavit. Additionally, Caitlin relied upon deposition testimony of the notary given after the submission of the Debtor's affidavit, that she did not recall having seen the Debtor during the time period the affidavit was notarized.

The Court concludes the information submitted by Caitlin is not sufficient to justify striking the Debtor's affidavit. First, in the excerpt of the notary's deposition, she was never asked directly whether she signed the affidavit. Rather, she was asked to give a writing sample, and was asked when she last saw the Debtor. The notary's response was, "I would say three to four months ago." Based on this response, Caitlin concludes the notary could not have signed the affidavit. This excerpt is insufficient. The Court needs to review the entire deposition to determine that there was no other discussion or explanation by the notary related to the affidavit. Moreover, the notary's answer is not an answer to the direct question of whether her signature is n the affidavit. Given that all issues must be resolved in favor of the non-moving party on a motion to strike, the notary's testimony is an insufficient basis on which to strike the affidavit.

The second basis for the Motion to Strike is the affidavit of Mr. Shiver, opining that after reviewing the various signatures of the notary, he finds it highly probable the signature of the notary on the Debtor's affidavit is not the notary's signature. Exhibit C1 to Mr. Shiver's affidavit is an explanation of "standard terminology for expressing conclusions of forensic document examiners." It explains that the

term "highly probable" means "the evidence is very persuasive, yet some critical feature or quality is missing so that 'an identification' is not in order; however, the examiner is virtually certain that the questioned and known writings were [or were not] written by the same individual." Given that there is some item missing that does not permit Mr. Shiver to be 100% certain the affidavit was not signed by the notary and that Mr. Shiver's testimony is not subject to cross-examination, the Court deems it insufficient to support the Motion to Strike. Before determining that a signature is forged, which is a very serious allegation, the Court would want to hear live testimony and give the parties an opportunity for cross-examination.

Finally, Caitlin argues the Court should not consider the Debtor's submissions in opposition to the Motion to Strike filed on January 12, 2015. While the Court recognizes the Debtor's response to the Motion to Strike was not timely filed, the Court will allow it. The delay by the Debtor did not harm any party. Moreover, there is legitimate confusion over whether the Debtor is represented in this action. An attorney appeared initially but now the Debtor is responding on his own behalf to all of the motions. The Court has therefore considered the submissions by the Debtor in responding to the Motion to Strike.

## SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The substantive

law [applicable to the case] will identify which facts are material". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 251–52, 106 S.Ct. 2505. The party moving for summary judgment has "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir.1991) (citing *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548).

Once this burden is met, the nonmoving party cannot merely rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(e). Rather, the nonmoving party must present specific facts that demonstrate there is a genuine dispute over material facts. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir.1993). Lastly, when reviewing a motion for summary judgment, a court must examine the evidence in the light most favorable to the nonmoving party and all reasonable doubts and inferences should be resolved in favor of the nonmoving party. *Id.*

## COLLATERAL ESTOPPEL

Both parties use the doctrines of collateral estoppel and *res judicata* in their arguments. Caitlin argues the findings and conclusions in the Superior Court Judgment and the Federal Court Verdict collaterally estop the Debtor from re-arguing those issues. The Debtor argues that Caitlin's failure to sue him for fraud in state court bars its attempt to claim the

debt is non-dischargeable under Section 523 on the basis of fraud.

*Collateral Estoppel Effect of Superior Court Judgment*

 The doctrine of collateral estoppel seeks to prevent the re-litigation of issues previously contested and determined by a valid and final judgment in another court. *Estate of Newton v. Lemmons (In re Lemmons),* 2005 WL 6487216, at *2 (Bankr.N.D.Ga.2005). The doctrine of collateral estoppel applies to non-dischargeability proceedings. *Id.* (citing *Grogan v. Garner,* 498 U.S. 279, 284 n. 11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). When reviewing a superior court judgment under the doctrine of collateral estoppel, a federal court must accord the judgment the same preclusive effect as it would be given under the law of the state in which the judgment was rendered. *Id.* (citations omitted).

 This Court must, therefore, turn to Georgia law to determine the preclusive effect of the Superior Court Judgment against the Debtor. *Hebbard v. Camacho (In re Camacho),* 411 B.R. 496, 501 (Bankr.S.D.Ga.2009). "While collateral estoppel may foreclose relitigation of issues decided in prior judicial proceedings, the ultimate issue of dischargeability is a legal question over which the bankruptcy court has exclusive jurisdiction." *Id.* (citations omitted). Under Georgia law, a party may only assert the doctrine of collateral estoppel when the following elements have been satisfied: (1) identity of the parties is the same; (2) identity of the issues is the same; (3) actual and final litigation of the issue in question occurred; (4) the adjudication was essential to the earlier action; and (5) the parties had a full and fair opportunity to litigate the issues in question. *Lemmons,* 2005 WL 6487216 at *2. The Debtor does not dispute that the identity of the parties is the same in this

dischargeability action as in the Superior Court action. As to whether the issues are the same, the Court will review the issues decided by the Superior Court Judgment in connection with its analysis of the relevant provisions of Section 523.

 The Debtor did not address the essentiality prong of collateral estoppel, but the findings and conclusions in the Superior Court Judgment were essential to the Judgment. Furthermore, the Debtor had a full and fair opportunity to litigate the issues in the Superior Court. The full and fair opportunity to litigate prong is grounded in due process concerns. *Microfinancial, Inc. v. Delpiano (In re Delpiano),* 2005 WL 6488906, at *5 (Bankr.N.D.Ga.2005). No evidence has been submitted challenging the due process provided to the Debtor in connection with the Superior Court Judgment. To the contrary, the documents submitted indicate the Debtor had every opportunity to litigate the issues but failed to cooperate in the discovery process. As the court in *League v. Graham (In re Graham),* 191 B.R. 489 (Bankr.N.D.Ga.1996) stated, "Other than his own willfulness and obstructionism, nothing prevented him from arguing his case to completion." *Id.* at 496.

 Finally, as to whether the matter was actually and finally litigated,

> Georgia case law does not disclose any analytical framework for determining whether a matter was actually litigated. However, "[a]s a general rule, when a question of fact is put in issue by the pleadings, is submitted to the trier of fact for its determination, and is determined, that question of fact has been 'actually litigated.'"

*Lusk v. Williams (In re Williams),* 282 B.R. 267, 272 (Bankr.N.D.Ga.2002) (alteration in original) (citations omitted). "Geor-

gia law recognizes a default judgment as a judgment on the merits entitled to preclusive effect." *McKelvey v. Murray (In re Murray)*, 2009 WL 6527593, at *2 (Bankr. N.D.Ga.2009) (citing *Graham*, 191 B.R. 489)). This Court concludes the matters determined in the Superior Court Judgment were actually litigated. Because the Superior Court Judgment was entered on October 31, 2012, and has not been appealed, it is a final judgment for purposes of collateral estoppel.

The Debtor argues, though, that the allegations made by Caitlin in the Superior Court complaint were fraudulent because Caitlin "falsely" alleged the Debtor was its attorney. Whether Caitlin made allegations that the Debtor disputes is not the relevant inquiry. The Debtor's dispute of Caitlin's allegations in the Superior Court action has been resolved through the Superior Court Judgment itself. If the Debtor disputes that Judgment, he must attack it in the court in which it was rendered. Further, Caitlin's allegation that the Debtor served as Caitlin's counsel need not be resolved for this Court to rule on the Motion as can be seen below. Only one count of Caitlin's Superior Court complaint relied upon the Debtor being Caitlin's counsel—the count for professional negligence. The counts for negligent misrepresentation, breach of fiduciary duty, and breach of contract do not rely upon the allegation that the Debtor served as counsel. Those allegations rely upon the Escrow Agreement which was entered into by the Debtor, statements made by the Debtor in whatever capacity, and his role as escrow agent under the Escrow Agreement. Therefore, the Court can proceed with its analysis without resolving the Debtor's dispute that he served as Caitlin's attorney. As such, the issues resolved by the Superior Court Judgment can be used by this Court to determine the dischargeability of the debt.

## *Res judicata* Does Not Bar This Dischargeability Action.

The Debtor argues that *res judicata* applies to bar Caitlin from alleging the debt is non-dischargeable on account of any element of fraud. The Debtor's argument is based on Caitlin's lack of fraud allegations in the Superior Court action. Several courts, however, including the United States Supreme Court, have explained that *res judicata* does not apply to bar a dischargeability complaint where the issues were not actually raised in the prior litigation. Although a non-bankruptcy court can determine liability and damages, only a bankruptcy court can determine dischargeability. *Sterling Factors, Inc. v. Whelan*, 245 B.R. 698, 708 (N.D.Ga.2000). Therefore, the normal rules of *res judicata*, which bar the litigation of any claim which was or could have been raised in prior litigation, would not apply. A dischargeability claim could not have been raised in the state court and therefore cannot be barred by the failure to raise it, or any component of it, in other litigation. *Schepperley v. DePinna (In re DePinna)*, 450 B.R. 337, 356 (Bankr.D.Conn.2011); *Russell v. Piercy (In re Piercy)*, 96 B.R. 953, 953–59 (Bankr. W.D.Mo.1989). In *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979), the United States Supreme Court rejected the argument that the bankruptcy court, in considering a dischargeability issue, was confined to the judgment issued in the state court and the record developed thereon. *Id.* at 2213. Lower courts have relied upon this analysis to conclude that collateral estoppel or *res judicata* applies only if there has been an actual state court determination on the same issue as the material issue in the dischargeability determination. The Debtor's argument that Caitlin is prohibited from raising any fraud related issues in the dischargeability context is wrong.

*Res Judicata Effect of a Criminal Verdict*

Caitlin also relies on the Federal Criminal Verdict to support its request for summary judgment. While the collateral estoppel effect of a state judgment is governed by state law, the collateral estoppel effect of a federal judgment is determined by federal law. The Eleventh Circuit has articulated the standard for issue preclusion of a federal judgment as follows:

> To claim the benefit of collateral estoppel the party relying on the doctrine must show that: (1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding.

*Christo v. Padgett*, 223 F.3d 1324, 1339 (11th Cir.2000) (citation omitted). The United States Supreme Court in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), explored the right of a party to use offensive collateral estoppel such as is sought here. In *Parklane*, shareholders brought suit against a corporation and its officers and directors, and asserted collateral estoppel as to issues decided in a prior SEC action against those same defendants. As the Supreme Court defined the issue,

> The threshold question to be considered is whether ... the petitioners can be precluded from re-litigating facts resolved adversely to them in a prior equitable proceeding with another party under the general law of collateral estoppel. Specifically, we must determine whether a litigant who was not a party

to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from re-litigating issues resolved in the earlier proceeding. *Id.* at 326, 99 S.Ct. 645. In *Parklane*, the Court rejected a requirement of mutuality, i.e., that only the same parties to the prior litigation could assert collateral estoppel. The Supreme Court "concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied." *Id.* at 331, 99 S.Ct. 645. Under the facts of *Parklane*, the Court noted that the private plaintiff could probably not have joined with the SEC in its injunctive action. The Court held further, "[I]n light of the serious allegations made in the SEC's complaint against the petitioners, as well as the foreseeability of subsequent private suits that typically follow a successful Government judgment, the petitioners had every incentive to litigate the SEC lawsuit fully and vigorously." *Id.* at 332, 99 S.Ct. 645. As a result, the Supreme Court held that private plaintiffs could use the results of a prior SEC enforcement action through collateral estoppel to support their case. The same considerations apply when considering the preclusive effect of a criminal conviction. *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1282 (11th Cir.1998); *Bryant v. Lynch (In re Lynch)*, 315 B.R. 173, 179 (Bankr.D.Colo.2004); *Harper v. Knight (In re Knight)*, 2004 WL 3186390 *2–3 (Bankr.E.D.Va.2004); *Allstate Life Ins. Co. v. Guerrerio (In re Guerrerio)*, 143 B.R. 605, 610 (Bankr.S.D.N.Y.1992).

The identity of the issues litigated in the criminal case with those necessary to establish non-dischargeability will be discussed below, but are based on the detailed indictment. There is no challenge

that the elements of the crimes of which the Debtor was convicted were actually litigated and critical and necessary to the verdict. The Debtor has not challenged he had a full and fair opportunity to litigate the elements of his criminal conviction. Even if the Debtor's conviction is on appeal, its pendency does not "alter the finality of a judgment for purposes of collateral estoppel or *res judicata*, unless the appeal removes the entire case to the appellate court and constitutes a proceeding *de novo.*" *Lynch*, 315 B.R. at 177; *see also Gen. Ret. Sys. of Detroit v. Dixon (In re Dixon)*, 525 B.R. 827, 837 (Bankr.N.D.Ga. 2015). Caitlin may rely on the facts necessarily decided in the Federal Court Verdict in its Motion for Summary Judgment.

*Non–Dischargeability under Section 523(a)(4)*

 Caitlin argues its claim for breach of fiduciary duty is non-dischargeable under 11 U.S.C. § 523(a)(4) because the Debtor committed fraud or defalcation while acting in a fiduciary capacity. A fiduciary relationship under Section 523(a)(4) is to be construed narrowly. *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir.1993) (citation omitted). "Section 523(a)(4) requires that the debtor, acting as a fiduciary in accordance with an express or technical trust that existed prior to the wrongful act, committed an act of fraud or defalcation." *Lemmons*, 2005 WL 6487216, at *4 (citation omitted). A technical trust has been defined by the Eleventh Circuit as "an express trust created by statute or contract that imposes trust-like duties on the defendant and that pre-exists the alleged defalcation," as opposed to constructive or resulting trusts. *Parker v. Ferland (In re Ferland)*, 2010 WL 2600588, at *3 (Bankr.M.D. Ga. June 21, 2010) (citation omitted); *see also Guerra v. Fernandez–Rocha (In re Fernandez–Rocha)*, 451 F.3d 813, 816 (11th Cir.2006).

"Mere friendship does not meet this standard, nor does an ordinary business relationship." *In re Ferland*, 2010 WL 2600588, at *3 (citation omitted). Thus, a plaintiff must show that (i) the debtor held a fiduciary position *vis a vis* the plaintiff under a technical, express or statutory trust; (ii) that the claim arose *while* the debtor was acting as a fiduciary; and (iii) that the claim is for fraud or defalcation. The fiduciary capacity alleged by Caitlin is that the Debtor was the escrow agent under the Escrow Agreement.

 While the meaning of the word "fiduciary" in Section 523 "is a question of federal law," *Smith v. Khalif (In re Khalif)*, 308 B.R. 614, 621–22 (Bankr.N.D.Ga. 2004), state law can be consulted in ascertaining whether such a duty has been imposed. *See Quaif*, 4 F.3d at 954. Here, the Escrow Agreement provides that is it governed by Arizona law. Arizona law expressly imposes a trust duty on an escrow agent. Under A.R.S. § 6–841.01(A), "An escrow agent is the trustee of all monies received or collected and held in escrow." This trust relationship is reiterated in Arizona case law. In *Maxfield v. Martin*, 217 Ariz. 312, 173 P.3d 476 (Ct. of App.2007), the court held,

> An escrow agent has a fiduciary relationship of trust and confidence to the parties to the escrow. As such he must perform his responsibilities with 'scrupulous honesty, skill, and diligence.' The escrow relationship gives rise to two specific fiduciary duties to the principals: to comply strictly with the terms of the escrow agreement and to disclose facts that a reasonable escrow agent would perceive as evidence of fraud being committed on a party to the escrow.

*Id.* at 478(internal citations omitted); *see also In re A & E Family Inv., LLC*, 359 B.R. 249, 256 (Bankr.D.Ariz.2007). More-

over, bankruptcy courts have frequently determined escrow agents to be the type of fiduciary whose debts are non-dischargeable under 11 U.S.C. § 523(a)(4). *Auburn Dev. Corp. v. Shorton (In re Shorton)*, 378 B.R. 424, 430 (Bankr.D.Mass. 2007) (escrow agent is a fiduciary under Section 523(a)(4) because the agreement required the funds to be held in an IOLTA account for the parties); *First Am. Title Ins. Co. v. Eberhart (In re Eberhart)*, 283 B.R. 97, 100–01 (Bankr.D.Conn.2002) (relying upon the Restatement of Trusts, an escrow agent is a party to an express trust which was created when one party sent money to the escrow agent to be held); *Stone v. Feldman (In re Feldman)*, 111 B.R. 481, 486 (Bankr.E.D.Pa.1990) (a depository under an escrow agreement occupies a fiduciary relationship as to the depositor for the purposes of Section 523(a)(4)). The Court concludes the Debtor is a fiduciary for purposes of Section 523(a)(4) because he was the named escrow agent under the Escrow Agreement and as such, had a fiduciary duty to Caitlin.

There is no doubt that the claim of Caitlin arose while the Debtor was acting in his fiduciary capacity as the escrow agent. Both parties acknowledge that Caitlin transferred $330,000 to the Debtor which was placed in his IOLTA account pursuant to the terms of the Escrow Agreement. Caitlin's claim arises from the Debtor's failure, as the escrow agent, to return those funds.

The final question is whether the Debtor committed fraud or defalcation in his fiduciary capacity. The definition of defalcation varied widely among the circuits until the Supreme Court took up the issue in *Bullock v. BankChampaign, N.A.*, —— U.S. ——, 133 S.Ct. 1754, 185 L.Ed.2d 922 (2013), on appeal from the Eleventh Circuit Court of Appeals. In *Bullock*, the

Supreme Court held that defalcation "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 1757. The Court explained that defalcation targets three types of behavior: (i) where the conduct at issue involves bad faith, moral turpitude, or other immoral conduct; (ii) intentional conduct that the fiduciary knows is improper; and (iii) reckless conduct of the kind that the criminal law often treats as the equivalent of intentional. *Id.* at 1759; *see also Reiss v. McQuillin (In re McQuillin)*, 509 B.R. 773, 788 (Bankr.D.Mass.2014); *Fogg v. Pearl (In re Pearl)*, 502 B.R. 429, 440 (Bankr.E.D.Pa.2013). The Court explained further "[w]here actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Bullock*, 133 S.Ct. at 1757 (citation omitted). The substantial and unjustifiable risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.* at 1760 (citations omitted). Finally, the Court clarified that defalcation includes non-fraudulent breaches of fiduciary duty. *Id.*

Since the issuance of the *Bullock* opinion, courts have struggled somewhat to apply the Supreme Court's explanation to specific facts, particularly in applying the recklessness standard. In *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42 (Bankr.

D.Colo.2014), the court examined each of the terms used by the Supreme Court in *Bullock*. The *Cupit* court's analysis was followed in *Cincinnati Insurance Co. v. Chidester (In re Chidester)*, 524 B.R. 656 (Bankr.W.D.Va.2015). The *Cupit* court noted the number of times the Supreme Court quoted from the Model Penal Code and the criminal law definitions of the terms used by the Supreme Court, as opposed to the civil definition of the same terms. The court noted that in the case of recklessness, the distinction between criminal and civil definitions is important.

> The test for criminal recklessness is subjective while the tort definition is objective. Under the civil definition, it is enough to show that the actor *should have known* of the risk of harm his actions created.... In criminal law, liability for reckless conduct depends on a finding that the defendant "disregards a risk of harm *of which he is aware*"

*Id.*(internal citations omitted). So, recklessness as defined in the penal code, and as used by the Supreme Court, requires a "state of awareness" of risk. A determination of criminal recklessness "is always made 'from the point of view of the actor's perceptions, i.e., to what extent he was aware of risk, of factors relating to its substantiality and of factors relating to its unjustifiability.' " *Id.* (citations omitted).

Of course the risk involved in a determination of defalcation is a risk that the debtor's conduct will violate a fiduciary duty, as compared to the risk in a criminal proceeding which typically involves harm to other parties. The *Cupit* court concluded "[t]here must be evidence that the debtor was subjectively aware that his conduct might violate a fiduciary duty. It is not enough that the debtor objectively *should have been* aware of the risk—such a finding would only support a finding of criminal negligence, not recklessness." *Id.* at

50. Under the *Cupit* court's analysis, a debtor cannot be subjectively aware that his conduct might violate a fiduciary duty if he is unaware of the existence of a fiduciary duty.

Next, the court in *Cupit* explored the meaning of willful blindness, which is also defined in the Model Penal Code. Generally, willful blindness in the criminal context applies to someone who is "aware of the probable existence of a material fact but does not determine whether it exists or does not exist." *Id.* at 52 (citation omitted). In *Global–Tech Appliances, Inc. v. SEB S.A.*, —— U.S. ——, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011), the Supreme Court established a test for willful blindness as follows: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of the fact." *Id.* at 2070.

Once a court has determined that a debtor either consciously disregarded or was willfully blind to a risk of violating a fiduciary duty, the court must determine that the risk disregarded was substantial and unjustifiable in order to establish the type of recklessness that makes a claim non-dischargeable under Section 523(a)(4). Substantiality is determined by the magnitude of the harm that would be caused, while the unjustifiability of an act is determined by balancing the nature of the conduct against the risk the act will violate a fiduciary duty. Both must be a gross deviation "from the standard of conduct observed by a law abiding person in that circumstance." *Bullock*, 133 S.Ct. at 1760.

Based on the foregoing, the requisite state of mind for defalcation can be established by showing either that the debtor intentionally acted wrongfully or that the debtor acted with criminal recklessness. Criminal recklessness can be established by showing either that the debt-

or consciously disregarded a substantial and unjustifiable risk that his actions would breach a fiduciary duty or that the debtor was willfully blind to a substantial and unjustifiable risk that his actions would breach his fiduciary duty. Both "conscious disregard" and "willful blindness" require proof that the debtor disregarded a harm of which he was aware. This means the debtor must have been subjectively aware he had a fiduciary duty and his actions risked breaching such a duty or that he was willfully blind meaning he was subjectively aware of the probable existence of a fact but did not make any effort to determine if the fact exists. With this background, the Court will now examine the Debtor's actions as established by the undisputed facts.

The facts show the Debtor acted at least with criminal recklessness. The Debtor was aware he was a fiduciary. The Debtor is a lawyer who was selling his services as an escrow agent. The Debtor was not a lay person serving as a trustee for a family trust like the fiduciary in *Bullock.* He intentionally agreed to be an escrow agent, and he signed the Escrow Agreement. The Debtor has not denied he was an escrow agent with the obligations thereof, but has only contested whether he was acting as Caitlin's attorney. The Court concludes the undisputed facts show the Debtor was aware he had a fiduciary duty as an escrow agent and the Superior Court Judgment establishes he breached the Escrow Agreement.

Since the Debtor was aware he had a fiduciary duty as an escrow agent, the Debtor's actions can be found criminally reckless if the Court concludes he consciously disregarded a risk that his actions in transferring Caitlin's money from his IOLTA account would be a breach of his fiduciary duty or if he was willfully blind to a substantial and unjustifiable risk that the transfer violated his fiduciary duty.

At this point, the Debtor's criminal conviction is probative and telling. The Debtor was convicted of conspiring to launder money and commit wire fraud and then was convicted of twelve counts of money laundering under 18 U.S.C. § 1957(a). A person is guilty of money laundering under Section 1957(a) if he "in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity".[1] Criminally derived property means "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). The courts are clear that convictions for money laundering under Section 1957(a) "require that a defendant know that the money used in a money laundering conspiracy derived from an illegal activity." *United States v. Alghazouli,* 517 F.3d 1179, 1189 (9th Cir.2008). The Debtor could not have been convicted under Section 1957(a) unless he knew that the transaction involved "criminally derived property", ... but he need not have known that the subject property was derived from 'specified unlawful activity' " [here, wire fraud]. *United States v. Gabriele,* 63 F.3d 61, 65 (1st Cir.1995). So, the Debtor's conviction of money laundering means that, with respect to each count, the Debtor knew that he was engaging in a monetary transaction in criminally derived property. The indictment includes individual counts for each transaction, identifying the transferor, transferee and the amount transferred.

---

1. Subsection (d) refers to the necessity of the offense taking place in the United States or special jurisdiction of the United States.

The Debtor was convicted on twelve counts. The counts on which he was convicted date from March 31, 2010 through May 18, 2011. PDH, the lender party to the Escrow Agreement, ultimately received all of the transferred funds listed in the indictment.

The Debtor's conviction establishes that the Debtor was involved in the transfer of money to PDH on at least three occasions prior to September 29, 2010, when Caitlin transferred funds to the Debtor. As of September 29, 2010, the Debtor knew that each of those three prior transactions involved the transfer of funds derived from a criminal activity. In each of the three prior transfers, the payee was PDH, the very same lender involved in Caitlin's transaction. Moreover, the Court notes the Debtor's IOLTA account reflects that, on September 30, 2010, the Debtor transferred $103,000 to Global Financial Holdings, Inc. directly from Caitlin's funds. The Debtor's IOLTA account specifies that the transfer was on behalf of Caitlin Energy Funding. Count Twenty of the indictment on which the Debtor was convicted, states that the Debtor transferred $30,000 on September 30, 2010 from Global Financial Holdings to PDH. It appears the transfer of $30,000 was of Caitlin's money.

The facts established by the Federal Court Verdict are binding on this Court. These facts demonstrate by a preponderance of the evidence that the Debtor disregarded a harm of which he was aware. Specifically, the Debtor was aware as of the date the funds were transferred to him by Caitlin that PDH, the other party to the transaction, was involved with the Debtor in money laundering of funds and that the source of those funds was from illegal activity. Since the Debtor was aware he had a fiduciary duty as an escrow agent at that time, the Court has no trouble inferring from all of the facts and circumstances that the Debtor was subjectively aware of the risk that transferring the funds from Caitlin to other parties in connection with the transaction with PDH would be a breach of his fiduciary duty.

Moreover, the Court concludes the Debtor consciously disregarded and was willfully blind to a substantial and unjustifiable risk that he would be breaching his fiduciary duty as an escrow agent by transferring Caitlin's funds from his IOLTA account to PDH through other parties. The Debtor was subjectively aware that his transfer of Caitlin's funds from his IOLTA account was likely a transfer of funds obtained in an illegal activity since it followed the pattern of the previous transactions with the same lender. The Debtor is charged with knowledge that the prior transactions involved the transfer of criminally derived property. The Debtor either did not seek confirmation as to whether Caitlin's funds were also proceeds of a criminally derived activity (in which case he turned a blind eye to that inquiry), or he inquired and knew for a fact that Caitlin's funds were the proceeds of illegal activity.

There is also no doubt the risk that the transfer of Caitlin's funds from the IOLTA account was a breach of his fiduciary duty was substantial and unjustifiable. The transfer involved 100% of the funds that Caitlin deposited with him and was over $300,000, a substantial amount. Moreover, given the Debtor's knowledge that all prior transactions with PDH involved the transfer of criminally derived property, assuming the risk that somehow Caitlin's funds were different was unjustifiable and a gross deviation from the conduct of a law abiding citizen in the same circumstance. The Court therefore concludes the Debtor committed defalcation while acting in a fiduciary capacity by transferring Caitlin's

funds from his IOLTA account while he served as an escrow agent.

## CONCLUSION

The undisputed facts show the Debtor committed defalcation while acting in a fiduciary capacity to Caitlin, causing Caitlin to lose $330,000. As such, Caitlin's claim is non-dischargeable under 11 U.S.C. § 524(a)(4). Judgment is entered for the Plaintiff, Caitlin Energy, Inc.